[Crim. No. 1188.   Second Appellate District, Division Two.—April 15, 1925.]

THE PEOPLE, Respondent, v. ROY A. HAYES, Appellant.

[1] APPEAL — POINTS NOT ARGUED IN BRIEF — CONSIDERATION OF.— Points which are stated in a brief but which are not argued are not to be considered.

[2] CRIMINAL LAW—BURGLARY—FAILURE TO CALL ALLEGED OWNER OF STOLEN ARTICLES AS WITNESS — SUFFICIENCY OF EXCUSE — EVIDENCE—PRESUMPTIONS.—In a prosecution for burglary based upon the taking, from a bungalow which was part of a private sanitarium for incompetent and weak-minded persons, of a phonograph and a radio set, sufficient excuse for the failure to call the occupant of the bungalow as a witness to prove his ownership of the articles was furnished by evidence showing that said occupant was wholly incompetent and unable to take care of himself, that he had been an inmate of the sanitarium for five or six years, that he was cared for by a nurse, a part of whose duty it was to superintend his undressing and his going to bed every night, and that the door of his bungalow was locked from the outside after he retired, the key being secreted on the porch of the house thereafter.

[3] ID.—OWNERSHIP OF STOLEN ARTICLES—FAILURE TO CALL WITNESS —PRESUMPTIONS—EVIDENCE—CONFLICT FOR JURY.—In such prosecution, even if such evidence did not furnish ample excuse for the failure to call the occupant of the bungalow as a witness to prove his ownership of the stolen articles, and if it were proper for the jury to have indulged the presumption that the occupant's testimony, if he had been produced, would have been adverse to the prosecution, such presumption, on the one side, and

certain testimony, on the other, showing ownership of the articles in the occupant, would have created nothing more than a conflict in the evidence, which the jury had the power to resolve in favor of the testimony.

[4] ID.—OWNERSHIP OF STOLEN PROPERTY — FINDING — EVIDENCE.—In such prosecution, the finding that the occupant of the bungalow was the owner of the stolen property was sufficiently supported by the evidence.

[5] ID.—TITLE — POSSESSION—EVIDENCE.—If it be necessary under a charge of burglary to prove anything concerning the title to the property stolen, in order to show an entry for the purpose of committing larceny, the charge is sufficiently proven in this regard if it be shown that the property was in the possession and under the control of the person from whom it is claimed to have been taken; and in such prosecution, the evidence showed that the stolen articles were in the possession and under the control of the occupant of the bungalow, either directly or through the employees of the sanitarium.

[6] ID.—ABSENCE OF PERMISSION TO REMOVE ARTICLES—EVIDENCE.— In such prosecution, assuming that it was necessary for the prosecution to prove the negative that no permission had been given to defendant or his companion to remove the phonograph and radio set from the bungalow, nevertheless the fact was established *prima facie* by the testimony of the assistant supervisor of the sanitarium, who testified that the occupant of the bungalow was under his care and supervision and that defendant's companion worked under his direction, and that he never gave the latter permission to take from the bungalow the articles which were stolen, and by the testimony of an attendant (whose duty it was to care for the occupant in the absence of his regular nurse), who testified that he gave neither defendant's companion nor defendant leave to enter the bungalow or to take from it the property which was stolen, and also by testimony to the same effect given by the occupant's nurse.

[7] ID.—INCOMPETENCY OF OWNER OF GOODS — GUARDIAN — PRESUMP- TIONS—APPEAL.—In such prosecution, there being nothing in the record to show that the occupant had a guardian, either of his person or of his property, appointed under the law, it cannot be presumed in aid of the appeal that he had one.

[8] ID.—VERDICT — EVIDENCE.—In such prosecution, the evidence was sufficient to support the conviction of defendant.

---

4. Right to possession of person from whom property is stolen as affecting crime of larceny, note, 13 Ann. Cas. 495. See, also, 17 R. C. L. 67; 15 Cal. Jur. 899.

8. Proof of *corpus delicti* in burglary, notes, 68 L. R. A. 41, 70, 71, 72, 73.

[9] ID.—CORPUS DELICTI—ADMISSIONS.—In such prosecution, the evidence was sufficient to prove the *corpus delicti,* and the same was sufficiently proved before evidence was received of the admissions of defendant.

[10] ID.—EVIDENCE.—It is sufficient, as a basis for the offer of a defendant's confession or admissions, if there is some proof, or *prima facie* proof, of even slight proof of the *corpus delicti.*

[11] ID. — TESTIMONY OF WITNESS ON PRELIMINARY EXAMINATION—READING TO JURY—ABUSE OF DISCRETION — DILIGENCE.—In such prosecution, the trial court abused its discretion in permitting the testimony of a party who acted as an intermediary in the sale of the stolen articles, given on the preliminary examination, to be read to the jury, in the absence of a sufficient showing that the witness could not with due diligence be found within the state.

[12] ID.—EXERCISE OF DILIGENCE IN PROCURING ATTENDANCE OF WITNESS—DISCRETION—APPEAL.—The question as to whether due diligence has been shown in an endeavor to procure the personal attendance of a witness, as a basis for the reception in evidence of his testimony given at the preliminary examination, is one primarily to be determined by the trial court, in the exercise of a sound discretion, and a ruling upon the question will not be disturbed on appeal, unless it appears that such ruling is the result of an abuse of the discretion reposed in the tribunal.

[13] ID.—RIGHT OF DEFENDANT TO BE CONFRONTED WITH WITNESSES—CHARACTER OF.—The right of the defendant in a criminal case to be confronted with the witnesses against him, while not guaranteed in this by the constitution, but secured only by statutory provision, is one of great value—the right thus given to a defendant by the statute is deemed a most substantial one.

[14] ID.—SECTION 686, PENAL CODE—CONSTRUCTION OF.—The language in section 686 of the Penal Code to the effect that the testimony of a witness at a preliminary examination may not be used at the trial in the superior court unless he "cannot with due diligence be found within the state," necessarily means that *some* effort must be made to locate the witness in the state at large

9. Proof of *corpus delicti* as essential to admissibility of confession, note, 1 Ann. Cas. 823. See, also, 1 R. C. L. 587.

10. Admissibility of former testimony of absent witness, notes, 1 Ann. Cas. 471; 13 Ann. Cas. 973; Ann. Cas. 1913C, 440, 464; Ann. Cas. 1917A, 658.

Admissibility in criminal trial of testimony given upon preliminary examination by witnesses not available at time of trial, note, 25 L. R. A. (N. S.) 868. See, also, 8 R. C. L. 214; 8 Cal. Jur. 125.

13. See 8 Cal. Jur. 129.

unless there is evidence from which the court may properly conclude that such a search would be unavailing; and the extent of that effort will be measured by the necessities of each particular case.

[15] ID.—QUESTIONS BY PROSECUTING OFFICER—EFFECT UPON RIGHTS OF DEFENDANT.—In such prosecution, the conduct of the prosecuting officer in asking defendant's companion while he was on the witness-stand, the question, "Before you ever made any statement to the police officers, didn't you ask them not to put you in a cell with (defendant), that he was liable to beat you up; that he was a three-time loser"? was harmless and did not constitute misconduct, where earlier in the trial, when one of the police officers was under cross-examination, defendant's counsel asked the witness: "Did you in these conversations with (defendant's companion) make the statement . . . that (defendant) was a bad egg, and that you were going to get him?" and to such question the officer answered, defendant's companion "made a statement to us that (defendant) was a three-time loser and not to lock him up with him, that he might kill him; that he was a bad egg," no motion being made to strike out the answer as not being responsive, nor any request made that the jury be instructed to disregard the answer.

[16] ID.—CONDUCT OF PROSECUTING OFFICER — FORM OF OBJECTION — ABSENCE OF REQUEST FOR ADMONITORY STATEMENT.—In such prosecution, the defendant is in no position to complain of the conduct of the prosecuting officer in asking defendant's companion whether defendant ever said anything to the witness about going out and stealing tires for a living and make a stated sum a night, where defendant's counsel objected to the question as not proper cross-examination and, after the prosecuting officer again asked the witness if defendant ever made such a statement, stated: "I do not see how that is an issue in this case," and the trial court made no ruling upon the objection and no response to counsel's last remark, and no request was made for an admonitory statement to the jury.

[17] ID.—WHEN REQUEST FOR ADMONITORY STATEMENT IS NECESSARY. In order that the claim of misconduct may be considered on. appeal it is necessary that the point shall have been made in the trial court, together with a request that the trial judge admonish the jury to disregard the fault, unless the alleged misconduct is of such an extreme character that an admonition will not remove its prejudicial effect.

[18] ID. — ARGUMENT. — In such prosecution, there was nothing improper in that part of the prosecuting officer's argument to the jury in which he referred to the defendant as a three-time loser,

16.  See 8 Cal. Jur. 508.

but if it were improper to make such reference the harm done could easily have been erased by admonition to the jury, which, however, was not asked for.

[19] ID.—MISCONDUCT. — In such prosecution, the prosecuting officer was guilty of misconduct in characterizing defendant, in his address to the jury, as a habitual criminal, whose soul was beyond redemption.

[20] ID.—IMPEACHMENT—INSTRUCTION.—In such prosecution, even if it were conceded that the trial court erred in instructing the jury that a witness may be impeached by proof that he has been convicted of a felony, because there was at the trial no witness to whom the instruction could properly apply, nevertheless a reversal of the judgment should not follow.

[21] ID.—PROPENSITIES AND PASSIONS OF ACCUSED—INSTRUCTION.—In such prosecution, where the trial court instructed the jury that "An inference must be founded on a fact legally proved, and on such a deduction from that fact as is warranted by a consideration of the usual propensities or passions of men, the particular propensities or passions of the person whose act is in question, the course of business, or the course of nature," that portion thereof which refers to "the particular propensities and passions of the person whose act is in question" was erroneous, for the reason that it was only the act of defendant which was under investigation on the trial.

[22] ID.—ABSENCE OF MISCARRIAGE OF JUSTICE.—In such prosecution, the errors of the trial court and the misconduct of the district attorney did not result in a miscarriage of justice.

(1) 4 C. J., p. 1069, n. 23.   (2) 16 C. J., p. 541, n. 84; 36 C. J., p. 910, n. 25.   (3)   36 C. J., p. 910, n. 25.   (4) 9 C. J., p. 1030, n. 82.   (5) 9 C. J., p. 1077, n. 39.   (6) 9 C. J., p. 1065, n. 21. (7) 9 C. J., p. 1075, n. 13   (8) 9 C. J., p. 1074, n. 6.   (9) 16 C. J., p. 737, n. 51.   (10) 16 C. J., p. 758, n. 55.   (11) 16 C. J., p. 757, n. 45; 17 C. J., p. 242, n. 48   (12) 16 C. J., p. 836, n. 39.   (13) 16 C. J., p. 758, n. 57.   (14) 17 C. J., p. 299, n. 30.   (15) 16 C. J., p. 915, n. 40.   (16) 16 C. J., p. 915, n. 40, 41.   (17)   16 C. J., p. 915, n. 40.   (18) 16 C. J., p. 908, n. 24.   (19) 17 C. J., p. 368, n. 5.   (20) 16 C. J., p. 907, n. 22.   (21) 17 C. J., p. 368, n. 5.

APPEAL from a judgment of the Superior Court of Los Angeles County and from an order denying a new trial. Carlos S. Hardy, Judge. Affirmed.

The facts are stated in the opinion of the court.

Kirby, Holland & Kirby for Appellant.

· U. S. Webb, Attorney-General, and John W. Maltman and H. H. Linney, Deputy Attorney-Generals, for Respondent.

WORKS, J.—The defendant Hayes, together with one Moe, was charged with the crime of burglary. A trial of the two jointly was commenced, but during its progress Moe, who had previously made a written confession of his culpability, pleaded guilty. The trial then proceeded against Hayes alone and he was convicted. He appeals from the judgment and from an order denying his motion for a new trial.

The charge against appellant was based upon the taking, from a bungalow which was part of a private sanitarium for incompetent and weak-minded persons, of a phonograph and a radio set. The bungalow was occupied by one Whiting, an inmate of the sanitarium, and one of the questions argued in the briefs is whether the articles which were taken were his property. Moe, up to the time of the burglary, had been a nurse at the sanitarium, and it is settled beyond dispute that he effected an entrance into the bungalow, that he took therefrom the articles mentioned, that appellant awaited him outside the house and near at hand while he did so, and that the two together then carried the "stuff" to an automobile in front of the sanitarium grounds, in which they, accompanied by a young girl, had driven to the place. Other facts, bearing upon particular points made by appellant for a reversal, will be stated as we proceed.

Appellant sets forth twenty-nine points in his brief, but no attempt is made to discuss the merits of many of them. [1] These we shall not decide, as it is a rule which should be well understood by the profession that points which are stated in a brief but which are not argued are not to be considered.

It is contended that the evidence was insufficient to support the verdict. A specific point made under this general specification is that the ownership of the phonograph and radio set was never proved by competent evidence. While there was much testimony that Moe told appellant, before they embarked on their alleged burglarious expedition, that the articles were his property, a circumstance which will later be the subject of treatment upon another point,

Moe testified positively that he did not own them. Whiting, whose testimony upon the score of an ownership in him would have been the most satisfactory, granting for the moment that he was competent to testify, was not called to the witness-stand. There was, however, other evidence introduced for the purpose of showing a title in that individual. The assistant supervisor of the sanitarium testified, without objection, that Whiting's bungalow was mostly furnished by the institution, but that "the individual" had belongings there; that Whiting owned a Victrola and radio set; and that the witness had seen the radio set in the bungalow nearly a year, and the phonograph several years. An employee of the sanitarium testified that he had been at work there for about two and a half or three years, that the phonograph was always in Whiting's bungalow, and that the radio was there five or six months. [2] It is a part of appellant's contention that as Whiting was not produced as a witness it must be presumed under a familiar rule of evidence that his testimony, if he had been produced, would have been adverse to the prosecution. The assistant supervisor of the sanitarium testified that Whiting was wholly incompetent and unable to take care of himself. There was also evidence to the effect that he had been an inmate of the place for five or six years, that he was cared for by a nurse, a part of whose duty it was to superintend his undressing and his going to bed every night; and that the door of his bungalow was locked from the outside after he retired, the key being secreted on the porch of the house thereafter. This evidence furnished ample excuse for the failure to call Whiting as a witness. [3] Even if it did not, however, and if it were proper for the jury to have indulged the presumption alluded to by appellant, nothing but a conflict of evidence would have arisen (*Maguire* v. *Cunningham*, 64 Cal. App. 536 [222 Pac. 838]), the presumption being arrayed on one side of the conflict and the testimony above referred to on the other. [4] The jury was, of course, clothed with the power to resolve the conflict in favor of the testimony and against the presumption, and the testimony furnished ample support for a finding that Whiting was the owner of the property. [5] It is also to be observed, in passing, that if it be necessary under a charge of burglary to prove anything concerning the title to the

property stolen (see 4 Cal. Jur., tit. "Burglary," sec. 19), in order to show an entry for the purpose of committing larceny, a point which we have not heretofore mentioned and which is not discussed in the briefs, the charge is sufficiently proven in this regard if it be shown that the property was in the possession and under the control of the person from whom it is claimed to have been taken (9 C. J., 1062). The evidence here showed that the stolen articles were in the possession and under the control of Whiting, either directly or through the employees of the sanitarium.

[6] It is insisted that the evidence was insufficient to support the verdict for the reason that there was no testimony to the effect that Whiting had not given Moe and appellant permission to take the phonograph and radio set. If it be assumed that such proof was necessary, we are satisfied that the point is sufficiently met by testimony in the record. The assistant supervisor of the sanitarium testified that Whiting was under his care and supervision and that Moe worked under his direction. He further testified that he never gave the latter permission to take from the bungalow the articles which were stolen. Here it is to be observed that there is no evidence that appellant ever entered the bungalow. An attendant at the sanitarium whose duty it was to care for Whiting in the absence of his regular nurse testified that he gave neither Moe nor appellant leave to enter the bungalow or to take from it the property which was stolen. Whiting's nurse testified to the same effect.

[7] There is nothing in the record to show that Whiting had a guardian, either of his person or of his property, appointed under the law, and it cannot be presumed in aid of the appeal that he had one. The witnesses above mentioned appear from the record to have been the only persons who had any direction of Whiting's affairs or who exercised any control over his property. Granting, for the sake of argument, again, that it was necessary for the prosecution to prove the negative that no permission had been given Moe or appellant to remove the phonograph and radio set from the bungalow (but see *People* v. *Moronati,* 70 Cal. App. 17 [232 Pac. 991]), we think that the fact was established *prima facie* by the testimony of the witnesses mentioned. The record is such that the jury was justified in concluding that there was no other person qualified

to give the permission in question. Certainly, there is evidence from which the jury might have inferred that Whiting himself was not qualified to give it. The point presented is without merit.

[8] The point is also made in a more general sense that the evidence was insufficient to uphold the conviction of appellant. We here recite the showing made against him by the record, leaving for a later time a statement of some slight features of the evidence which operated in his favor, as we are interested in the inculpating testimony alone in considering the question now presented. The alleged crime was committed in the evening. The girl who accompanied Moe and appellant to the sanitarium, and who was apparently free from guilty knowledge concerning their acts, testified that two trips were made to the place; that on the first occasion the three arrived there at about 8 o'clock; that the two defendants then went into the place and shortly came out, whereupon the three drove away; that they returned twenty minutes or half an hour later, that Moe went into the place first, and that appellant followed him; that after five minutes they came back with the phonograph and radio set, appellant carrying a part of the two outfits and Moe the remainder; and that the articles were then taken to appellant's apartment. Viewing the evidence in the order in which it was produced at the trial, the next witness was one MacClark, who testified that the day following the alleged burglary he purchased the stolen property from one Guin, giving him twenty dollars for it. Moe testified that appellant accompanied him when he went to the bungalow to get the property which was taken and remained outside the house while Moe went inside; that the articles were then taken in the automobile to an apartment which he and appellant rented together; that he, Moe, went with Guin to MacClark's place when the stolen property was sold to the latter; that after the sale they returned to the apartment, where appellant was waiting, and Guin handed the proceeds of the sale to appellant, who complained of the smallness of the amount obtained and then handed the money to Moe; that he, Moe, then gave a "few dollars" of the twenty to Guin and a "few dollars" to appellant; and that he and appellant together arranged with Guin to sell the property. As already observed, Moe made written confession of his guilt.

After appellant was arrested he was made acquainted with this fact, and was asked by officers if he desired to make a statement. He said, Moe being present: "No, there is no use. That bastard has already told you everything. There is no use for me to make a statement." Appellant made use of other expressions to the officers which the jury was justified in interpreting, in connection with other evidence in the case, as opposed to his plea of not guilty. One of the officers testified to the following conversation with him: "I asked him where he got that Victrola box. He said he didn't know. He said he didn't know anything about it. He said he didn't know where it came from. I asked him if he did not bring it up to the room, and he said no. I asked him if he knew who did. He said no, he didn't; he hadn't the least idea in the world where it came from." Again, from the same officer: "Q. Did you ask him whether or not he went out there with Moe and took this stuff? A. Yes. Q. What did he say? A. He said he did not. He said he had not been out there; knew nothing of the place. Q. Did you ask him whether or not he had ever been out with Moe? A. He said he had not." With this array of evidence, added to the facts which are above stated, it is futile to assert that the record is insufficient to support the conviction of appellant.

[9] The contention is made that there was no proof of the *corpus delicti*. This point requires no lengthy discussion. The facts already stated, independently of the admission of appellant, will demonstrate that the contention is not well founded.

We are satisfied, also, that the *corpus delicti* was sufficiently proved before evidence was received of the admissions of appellant. [10] "It is sufficient," as a basis for the offer of a defendant's confession or admissions, "if there is some proof, or *prima facie* proof, or even slight proof of the *corpus delicti*" (8 Cal. Jur., tit. "Criminal Law," sec. 303). Without segregating here the evidence which was received before the testimony concerning appellant's admissions went to the jury, we are satisfied that the proof came well within the rule stated.

[11] Guin, the individual who acted as an intermediary in the sale of the stolen property to MacClark, did not appear as a witness at the trial, but his testimony taken at the

preliminary examination was read to the jury over appellant's objection.  It is insisted that no sufficient foundation was laid for the introduction of the evidence in this form, in that there was no showing of due diligence in an endeavor to procure the personal attendance of the witness.  Such foundation as there was is confined to the testimony of two witnesses.  The first of these was an investigator, a deputy sheriff, who was connected with the district attorney's office.  It appearing that at the preliminary examination Guin had given his address as a certain number on West Third Street in Los Angeles, the investigator testified that he had called at that address, that the proprietor of the place, a hotel, told him that Guin no longer resided there and that on departing he had left no forwarding address; and that the proprietor said he did not know where Guin was.  Guin testified at the preliminary examination that he "used to live" at Pasadena with his mother.  Taking this statement as a guide in his search, the investigator said he visited Pasadena and the adjacent town of Altadena.  He testified that he saw all persons named Guin in the two places, there being one of that name in each, but found that neither of them was related to the absent witness.  The record discloses that at the time of the sale of the phonograph and radio set to MacClark the missing witness was employed by the "Shopping News," evidently a newspaper, in Los Angeles.  The witness Mac-Clark was then also an employee in the same establishment.  The investigator testified that he sought Guin at the office of the paper, that he was no longer employed there, that he had left no forwarding address at the place, and that no information could be obtained there as to where he had gone when his employment terminated.  He further testified that he visited the postal inspector at the postoffice at Los Angeles and was informed by that official that there was in the office no change of Guin's address from the number on West Third Street; that he had searched the city directory of Los Angeles and that Guin's name was not contained in it.  He testified to the same effect concerning the directories of Pasadena and Altadena.  On cross-examination the investigator testified that he had begun his investigation on the first or second day of the month of the trial, the trial having been commenced on the eighth and the taking of the evidence having been concluded on the same day; that he had

never actually visited Pasadena on his quest until the morn-
ing of the trial, having theretofore used the telephone "on
some occasions" to obtain information from there; that he
made no investigations as to whether Guin was deceased;
that he visited the county hospital at Los Angeles, the witness
MacClark having told him that Guin had been the victim of
a heart attack and had been taken to that place, but that
he did not find the absent witness there, nor any record of
his having been there; and that he did not visit "the jails"
or any other hospital. The testimony of Guin at the prelim-
inary examination was then offered by the district attorney,
but upon objection being made to the offer the court called
MacClark to the witness-stand. He testified that the last
time he saw Guin he was taken sick; that Guin said it was
a heart attack, but that he, MacClark, thought he had been
drinking; that the seizure occurred at the office of the "Shop-
ping News," that Guin was sent home in a taxicab, and that
"his people were sent for and he stayed home three or four
days from work." This question was then put to the wit-
ness: "Then what happened?" The answer was that Guin
came back to work the next day, but "they told him his
job wasn't there any more," that he was "let off." Mac-
Clark next testified that Guin "went from there down to the
L. A. Engraving Company and worked there a week, and
he suddenly disappeared from there"; that he, MacClark,
wanted to get in connection with Guin and called up the
L. A. Engraving Company; that the manager of that con-
cern then told him that Guin "laid off from work, and the
last they heard of him he was taken sick and was in the
county hospital with a heart attack; and if they wanted him
to come to work, he left them some telephone number";
that he, MacClark, did not "know the number that he had
left"; that his talk over the telephone with the manager of
the engraving company was "the latter part of last month
. . . later than a week ago"; that Guin "left a telephone
number and said he had been in the county hospital with a
heart attack, and if they needed him to employ him again,
he left an address, wherever it was"; that "they" did not
say it was a telephone number in Los Angeles; that "I don't
know the number at all"; and that "they didn't give me the
number." At this juncture the trial judge remarked: "I
think you will have to have the engraving company here. . . .

Let the investigator telephone and find out what he can from the L. A. Engraving Company. . . . We will take a recess . . . for five minutes.'' After the recess the trial was resumed, but the investigator was not called. MacClark again took the stand and testified, upon questions by the district attorney, that he had been down to the Los Angeles Engraving Company the day before the trial; that he then saw the manager of the concern; that he asked him if he had any information as to where Guin could be located and he said at the number of West Third Street. ''I asked him if he had any other address, and he said no, just the one he just gave me. Q. Did he say anything about the county hospital? A. No, sir. Q. Did he say anything about a phone number? A. No, sir.'' Upon questions by counsel for the defense MacClark then testified: ''Q. He did not give you the 'phone number? A. No, sir. Q. Did he tell you when he was last at . . . West Third Street? A. He did not. . . . Q. Did he tell you when he had left his employment there? A. No, sir. Q. Did you ask him? A. No, sir.'' Thus was left the evidence upon the question of due diligence and, after a repetition of objection, the testimony of Guin at the preliminary examination was read to the jury.

The admission in evidence, in criminal trials in the superior court, of the testimony of witnesses given at preliminary examinations, is governed by the provisions of section 686 of the Penal Code. The enactment reads, in part: ''In a criminal action the defendant is entitled: . . . To . . . be confronted with the witnesses against him, in the presence of the court, except that where the charge has been preliminarily examined before a committing magistrate and the testimony taken down by question and answer in the presence of the defendant, who has, either in person or by counsel, cross-examined or had an opportunity to cross-examine the witnesses, . . . the deposition of such witness may be read, upon its being satisfactorily shown to the court that he is dead or insane, or cannot with due diligence be found within the state. . . . '' The question as to what amounts to ''due diligence,'' as that term is used in the quoted enactment, has been before the courts with great frequency. In the following cases, under the particular facts appearing in each, it was determined that due diligence was shown: *People* v. *Reilly*, 106 Cal. 648 [40 Pac. 13]; *People* v. *Witty*, 138 Cal.

576 [72 Pac. 177]; *People* v. *Lewandowski,* 143 Cal. 574 [77 Pac. 467]; *People* v. *Grill,* 151 Cal. 592 [91 Pac. 515]; *People* v. *Leavens,* 12 Cal. App. 178 [106 Pac. 1103]; *People* v. *Edwards,* 14 Cal. App. 128 [111 Pac. 263]; *People* v. *Boyd,* 16 Cal. App. 130 [116 Pac. 323]; *People* v. *Lederer,* 17 Cal. App. 369 [119 Pac. 949]; *People* v. *Kelly,* 17 Cal. App. 447 [120 Pac. 46]; *People* v. *Dene,* 20 Cal. App. 137 [128 Pac. 339]; *People* v. *Mueller,* 168 Cal. 526 [143 Pac. 570]; *People* v. *Trent,* 25 Cal. App. 740 [145 Pac. 541]; *People* v. *Poo On,* 49 Cal. App. 219 [116 Pac. 323]; *People* v. *Ramos,* 52 Cal. App. 491 [199 Pac. 544]; *People* v. *Brown,* 61 Cal. App. 748 [216 Pac. 58]; *People* v. *Frank,* 193 Cal. 474 [225 Pac. 448]. There is at least one case in which, under the facts there appearing, it was held that the requirement as to due diligence was not satisfied: *People* v. *Ballard,* 1 Cal. App. 222 [81 Pac. 1040]. **[12]** It is well settled that the question as to whether due diligence has been shown in an endeavor to procure the personal attendance of a witness, as a basis for the reception in evidence of his testimony given at the preliminary examination, is one primarily to be determined by the trial court, in the exercise of a sound discretion, and that a ruling upon the question will not be disturbed on appeal unless it appears that such ruling is the result of an abuse of the discretion reposed in the tribunal (*People* v. *Mueller, supra; People* v. *Brown, supra*). While each of the cases in the long list cited above was necessarily different in its facts from all the others, the collection nevertheless furnishes some guide to a determination of the question now before us. Following that guide and, moreover, reasoning from general principles which must govern in such cases, we are satisfied that there was an abuse of the trial court's discretion in permitting Guin's ''deposition'' to be read to the jury. **[13]** As a prelude to a more specific examination of the subject, it is to be observed that the right of the defendant in a criminal case to be confronted with the witnesses against him, while not guaranteed in this state by the constitution, as it is in some of the constitutions of the sister commonwealths, but secured only by statutory provision, is one of great value—''the right thus given to a defendant by the statute is deemed a most substantial one'' (*People* v. *Plyler,* 126 Cal. 379 [58 Pac.

904]). "That the right of a defendant to be confronted in person by the witnesses against him is a most important one, and that the trial court should be fully satisfied by the evidence that the absent witness cannot with due diligence be found in the state before allowing the deposition of such witness taken on the preliminary examination to be read, may be freely conceded" (*People* v. *Lewandowski, supra*). What are the circumstances present in the instant case which show an abuse of discretion by the trial court? It was said as to the missing witness in question in *People* v. *Reilly, supra,* "that diligent efforts to find him had been made in all those portions of the city where he had been accustomed to wander, and where he would be likely to be found, but that all such efforts had been unsuccessful." No such search was made for Guin. He was a photo-engraver by trade. No endeavor was made to locate him at any of the places of business in Los Angeles at which such a craftsman might hope to find employment, except the two at which it was known that he had been employed, nor was such a search made in cities of considerable size which are within easy reach of Los Angeles, notably Long Beach, Santa Monica, Glendale, and Pasadena. No investigation of such a character was made in any of the other cities of Southern California, nor, in fact, in any of the other cities of the state. [14] The statute provides that the testimony of a witness at a preliminary examination may not be used at his trial in the superior court unless he "cannot with due diligence be found within the state." This language necessarily means that *some* effort must be made to locate the witness in the state at large unless there is evidence from which the court may properly conclude that such a search would be unavailing. In one case (*People* v. *Witty, supra*), subpoenas were sent to the sheriff of every county in the state in an endeavor to secure the attendance of the absent witness, and forty-six of the officers made return that after due diligence he could not be found in their respective counties. No attempt of any character was made to locate Guin anywhere outside of Los Angeles County. We have not overlooked the fact that it was said in *People* v. *Boyd, supra,* that it is not necessary, in order to disclose due diligence, to show that a subpoena for a missing witness has been sent to every county in the state. In that case, how-

ever, there was ample evidence justifying a finding that the witness there in question was in hiding in a particular county for the purpose of avoiding the service of process. That evidence supported the action of the trial court in allowing the use of the deposition of the witness. Pursuing further the remark in *People* v. *Boyd,* we do not mean to say that it can be laid down as a hard-and-fast rule that subpoenas need be sent to any county in the state from a county in which the attendance of a witness is desired, before his deposition may be received in evidence. We do say, however, that where, as here, there is no evidence tending to show that the witness has left the state, there must be some endeavor to ascertain whether he is in the state at large. The extent of that endeavor will be measured by the necessities of each particular case.

We need not further continue this subject from the standpoint of the language of the courts of the state in the decided cases, practically all of which we have cited, nor need we point out other weaknesses, except one, in the showing made. We close with a reference to one circumstance appearing upon the present appeal—a circumstance which alone shows a lack of due diligence in the quest for Guin. The testimony of MacClark is plainly to the effect that Guin gave to the Los Angeles Engraving Company a telephone number through the use of which he might be located. This number may have been that of the telephone at his Third Street address. On the other hand, it may not have been. No attempt was made to ascertain whether it was or whether it was not. This avenue, if followed, might have led to a discovery of the witness, and there was a lack of diligence in not following it. The court erred in allowing the deposition of Guin to go to the jury. Whether this error was harmful will be considered later.

[15] It is complained that the district attorney was guilty of misconduct during the trial. This contention is made upon several grounds. When Moe was on the witness-stand the prosecuting officer, for the purpose of showing that the witness was testifying in behalf of appellant through fear, asked him, "Before you ever made any statement to the police officers, didn't you ask them not to put you in a cell with Red [Hayes], that he was liable to beat you up; that he was a three-time loser?" Counsel for ap-

pellant, evidently assuming that the expression "three-time loser" meant that appellant had been thrice convicted of crime—an assumption which is made throughout the briefs on this appeal—objected to the question on the ground that counsel "well knows he cannot test the record of this man unless he has been on the stand," and moved that it be stricken. On this objection and motion the trial court ruled adversely to appellant and the question was answered in the affirmative. If we concede for the moment that in asking the question the district attorney was guilty of misconduct, and if we grant further that the objection and motion of appellant was sufficient to present the charge of misconduct to the trial court, we hasten to observe that the action of the district attorney was harmless. Earlier in the trial, when one of the police officers was under cross-examination, appellant's counsel asked the witness: "Did you in these conversations with Mr. Moe make the statement . . . that Hayes was a bad egg, and that you were going to get him?" To this question the officer answered: "Mr. Moe made a statement to us that Mr. Hayes was a three-time loser and not to lock him up with him, that he might kill him; that he was a bad egg." The answer was not responsive and should have been stricken on motion, but no such motion was forthcoming, nor was the court asked to instruct the jury to disregard the answer. As the expression "three-time loser" was thus fastened upon the minds of the jurors through the act or omission of appellant's counsel early in the trial, the action of the district attorney in later employing it could have worked no damage to appellant's rights. For the same reason his putting the question was not misconduct.

[16] The following appears in the record during the cross-examination of Moe by the district attorney: "Q. . . . Did Hayes ever say anything to you about going out and stealing tires for a living? A. No, sir. . . . Q. That you go out and steal tires and make about $10 a night? Mr. Holland: I object to that as not proper cross-examination. Q. . . . I am asking you if Hayes ever said that to you? Mr. Holland: I do not see how that is an issue in this case." No ruling was made by the court upon the objection of counsel and no response was made by the judge to his last

remark. It is now contended that the district attorney's action in asking the questions set forth was misconduct, but appellant is in no position to present that question here. [17] In order that the claim of misconduct may be considered on appeal it is necessary that the point shall have been made in the trial court, together with a request that the trial judge admonish the jury to disregard the fault, unless the alleged misconduct is of such an extreme character that an admonition will not remove its prejudicial effect (8 Cal. Jur., tit. "Criminal Law," secs. 321, 521). Here the objections were not such as to inform the court that misconduct was claimed and there was no request for an admonitory statement to the jury. If such a request had been made the effect of the misconduct, if any there was, could have been removed by an admonition. The point is, therefore, not well taken.

[18] The following record was made during the final argument of the district attorney to the jury: "Mr. Jordan: . . . I think it has been fully demonstrated to you that the burglary was committed out there, and the ringleader, and the man who stands back of it, a three-time loser, that puts the other boy— Mr. Holland: I object to that as improper. There is no evidence in this record to show that this man is at any time a loser. Mr. Jordan: There is evidence here— The Court: Yes, there is. . . . Mr. Jordan: And that Moe, perhaps knowing nothing about this business, falls in and commits this burglary. . . . Then after they get down to the apartment, who is the one most interested in getting the money out of this stuff? Moe is scared to death, from the time he is arrested, of this defendant, asked the police officers to put him in another cell, that Red would kill him. Mr. Holland: . . . I object to that statement as not being in the record. Mr. Jordan: It is in the record. The Court: Proceed with your discussion of the evidence. Mr. Jordan: . . . I want to say to you, ladies and gentlemen, that on two occasions on this witness stand, on direct examination and on cross-examination [two police officers] testified that Moe said Hayes was a three-time loser, not to lock him up in the same cell with him or he would kill him; and that is why Mr. Moe is taking all the blame. And Hayes himself says, 'I have been in trouble before. I cannot afford to talk.' [Substantially this statement was attributed to

appellant by one of the officers.] And when Hayes is told that Mr. Moe has made a confession, . . . and asked if he wants to make a statement, and he says, 'No, the bastard has told you all about it. Why should I talk?' And doesn't that show that there is malice, that there is death in the defendant's heart? He doesn't talk; but the new man, the apprentice, talks, confesses. Mr. Holland refers [in his argument, evidently], to Jesus Christ on Calvary. "Christ is still here and willing to redeem this defendant's soul. After the first time there was no redemption; after the second time there was no redemption; after the third time he is beyond redemption. And now, ladies and gentlemen, you are looking upon a habitual criminal that none of us can redeem from the world of crime. . . . Mr. Holland: . . . I wish to object to that portion of the argument of counsel for the people in reference to the fact that this man is a three-time loser; prejudicial and improper. The Court: The jury will remember what the testimony is and be guided entirely by the testimony.''

It is to be observed that the only objection made by appellant's counsel during the district attorney's address to the jury was that it was improper for the speaker to refer to appellant as a three-time loser, except for an unfounded objection that certain matter was not in the record. There was nothing improper, under the circumstances to which we have already adverted, in the district attorney's mere reference to appellant as a three-time loser. Further, if it were improper the harm done by it easily could have been erased by admonition to the jury, but no admonition was asked for. This objection may, therefore, be summarily dismissed from consideration. Departing, however, from the limited scope of his assault at the trial upon the remarks of the prosecuting officer, but omitting objections which he might have made either in the trial court or here, appellant now contends that the prosecutor was guilty of misconduct in that part of his remarks following his reference to the Master—in his language characterizing appellant as an habitual criminal whose soul was beyond redemption. [19] We think that in the designated portion of his address the prosecutor was guilty of misconduct. He there allowed his zeal to overcome his judgment, and he there took an attitude which was unfair to appellant. No objection having been made

to this misconduct at the trial, and the judge not having been requested to admonish the jury to disregard it, we shall not decide that such objection and request was necessary, but shall assume, without deciding, that no admonition could have eradicated the harm done. We make this assumption solely for the reason, as we shall later point out, that the record against appellant is such that the jury could not well have avoided convicting him, even with that record unpurged of its showing as to the prosecutor's misconduct.

[20] It is contended that the trial court erred in instructing the jury that a witness may be impeached by proof that he has been convicted of a felony. It is said that there was at the trial no witness to whom the instruction could properly apply. We have already observed that Moe, against whom the trial was commenced as a codefendant with appellant, pleaded guilty during the progress of the hearing. It was after the entry of the plea that he became a witness. Did his plea of guilty amount to proof that he had been convicted of a felony? If he did, was the instruction so framed as to apply to him, there being no instruction that a plea of guilty amounts to proof of conviction? These questions we shall not pause to decide. For reasons hereafter to be stated, it is our opinion that no reversal of the judgment against appellant should follow, even if it were conceded that the questioned instruction was erroneous.

[21] The jury was instructed: "An inference must be founded on a fact legally proved, and on such a deduction from that fact as is warranted by a consideration of the usual propensities or passions of men, the particular propensities or passions of the person whose act is in question, the course of business, or the course of nature." It is claimed that this instruction was erroneous in its reference to "the particular propensities and passions of the person whose act is in question." We think the portion of the instruction which is assailed was erroneous for the reason that it was only the act of appellant which was under investigation on the trial. There was no evidence of the possession by him of peculiar propensities or passions. We shall deal later with the question whether the error in giving the instruction was prejudicial to the substantial rights of appellant under the constitution.

[22] We have made a careful examination of the entire cause now before us, including the evidence, and having in mind the provisions of section 4½ of article VI of the constitution, we must determine whether the errors of the trial court and the misconduct of the district attorney have resulted in a miscarriage of justice. We first, however, state the nature of the evidence erroneously received in the form of the deposition of Guin, as the bearing of the error in admitting the deposition upon the merits of the cause will not otherwise be understood. Guin's testimony at the preliminary examination was principally corroborative of the testimony of MacClark and Moe, although the latter was sworn as a witness for the defense, but it also covered certain other matters. The deposition was to the effect, in addition to the matters of corroboration just mentioned, that appellant told Guin, upon showing him the stolen articles, that he had gotten them from some person in lieu of a debt due him from that person; that appellant alone arranged with him to sell the "stuff"; and that when he left appellant and Moe, after delivering the proceeds of the sale to the former, the money was still in his possession.

Disregarding the contents of Guin's deposition, the undisputed evidence in the case was that appellant and Moe together removed the stolen property from the sanitarium grounds; that they then took the articles to an apartment occupied by appellant, although Moe testified that he had paid a part of the rent upon it; that appellant at least aided in procuring Guin to sell the articles; that he kept or was given at least a part of the proceeds of the sale; that when told Moe had confessed he said that the bastard had told the officers everything and that there was no use in his making a statement; and that he denied all knowledge of the manner in which the stolen property came into his apartment, and denied that he had ever been with Moe to the sanitarium, although he later admitted the last-stated fact. The sole defense interposed by appellant was that Moe had told him, not alone that the phonograph and radio set were his property, but that he had left his personal belongings at the sanitarium and that he desired appellant to go with him to procure them. We shall state all the evidence bearing upon this defense and shall then make an estimate of the effect which it, both inherently and as opposed to the

inculpatory evidence, must have had upon the jury. The girl who went to the sanitarium with Moe and appellant testified: "Mr. Moe asked Mr. Hayes to go out there with him to get some of the things. He said he quit his job and he wanted to take them away; but Mr. Hayes said he could not go because he promised to take me to the skating-rink. But Moe kept on asking him, and finally he said if I wanted to go out there with him they would go out and get his things." It was also shown that at the police station the girl had made a statement to the effect that Moe said "he had a phonograph and some other things he wanted to get, so he went over there in an automobile." An aunt of the girl testified: "Mr. Moe asked Mr. Hayes if he could go out with him and help him bring in his things. . . . He said he had his trunks and things out there that he wanted to bring in." Moe testified: "I went over to Mr. Hayes' apartment and asked Mr. Hayes if he would come over and get my radio and phonograph. I said, 'I am working out here in a sanitarium and I am quitting my job in a few days.' . . . I just told him, 'I have got a radio and Victrola out here and I want you to come out and get it for me and put it in your apartment.' " On Moe's cross-examination this is a part of the record: "Q. Didn't you say something about going over and getting a trunk, too, along with this radio and Victrola? A. Well, my clothes. Q. You didn't get your clothes that night, did you? A. No, sir." In our view the defense made by appellant must have appeared to the jury to be a mere sham. Observe how the two malefactors went about the business of getting Moe's "things"—his trunks, his clothes, his personal belongings. They, in company with the girl, went to the sanitarium twice. On the first visit the two men entered the grounds and in a few minutes returned to the automobile empty-handed. No explanation is made as to the purpose of this preliminary invasion of the premises. What possible reason was there for it if appellant had been hoodwinked into the belief that he was merely aiding Moe to get his property? The jury must have believed that it was a mere reconnoitering expedition, that, whatever may have been said in the presence of the women as a "blind," the purpose of the original entry of the premises was to ascertain if the coast was clear, and that appellant knew that to be the purpose. The party re-

turns to the place after twenty minutes or half an hour, and the two culprits again enter. They then emerge, not with the personal impedimenta which in the main was to have been taken from the institution by the man who was giving up his job, but with a phonograph and radio set only. Nothing more is ever heard of Moe's general personal belongings. It is useless further to discuss what must have appeared to the jury as a simulated defense, cooked up in an endeavor to forestall the conviction of appellant, except to say that when the circumstances attendant upon the defense were added to the evidence against appellant which is recited above the jury must have seen confirmation of appellant's guilt strong as proof of holy writ. The errors of the trial court and the misconduct of the district attorney did not result in a miscarriage of justice. In our view, under an endeavor to put ourselves in the place of the jury in so far as we may do so from the typewritten record, a miscarriage of justice would have resulted had appellant not been convicted, error or no error.

Judgment and order affirmed.

Finlayson, P. J., and Craig, J., concurred.