[Crim. No. 2773. First Dist., Div. One. Nov. 10, 1952.]

THE PEOPLE, Respondent, v. PATRICK CLIFFORD KING et al., Appellants.

Jack Loring Scott, in pro. per., and Thomas C. Vassar for Appellants.

Edmund G. Brown, Attorney General, Clarence A. Linn, Assistant Attorney General, Wallace G. Colthurst, Deputy Attorney General, Louis Dematteis, District Attorney, and Leo Englert, for Respondent.

PETERS, P. J.—Patrick King and Jack Scott were jointly charged with armed robbery and armed burglary. The robbery charge was later dismissed. After a lengthy second jury trial, the first jury having disagreed, both defendants were found guilty of first degree burglary. Both appeal. Both defendants were represented by counsel at the trial, but both appealed in propria persona. Defendant King subsequently secured the services of an attorney, but defendant Scott presents his own appeal.

The charges involved grow out of the burglarizing of an Andrew Williams Store in San Mateo, on the evening of September 24, 1950. Several months later the two defendants were separately arrested, King in San Francisco, and Scott in Los Angeles, brought to San Mateo County and charged with the offense, and, on their second trial, convicted.

Both appeal. They both strenuously attack the sufficiency of the evidence of identification, and jointly and severally attack the judgment on various other grounds. We are convinced that the evidence is sufficient to support the judgment, and that, although some errors occurred during the trial, such errors were minor in character and did not result in a miscarriage of justice. Under article VI, section 4½ of the Constitution, they do not require or permit a reversal.

At the trial three clerks and the assistant manager of the store positively identified King as one of the burglars, and the three clerks positively identified Scott as the other burglar. The assistant manager did not identify Scott.

The burglary occurred under the following circumstances: The three clerks—James Alston, John Hurn and Maurice Agrella—at about 10:30 p.m. on the night in question were locking up and leaving the store when two men, later identified as King and Scott, with handkerchiefs over their faces

and guns in their hands, ordered the clerks back into the store. The bandits then escorted the three clerks, at gunpoint, to a storeroom adjoining the office located on the mezzanine floor. At this time the main floor of the store had two of its eight banks of fluorescent lights lit, the storeroom was lighted by a 60-watt globe, and the adjoining office, the door of which was open, was fully lighted with fluorescent lights. The two bandits ordered the clerks to open the safes, but none of them had the combinations. The bandits, using threats, demanded the name of any employee who could open the safes, and the name of Frank Johnson, the assistant manager, was mentioned. After some further threats it was' decided by the bandits that Hurn should call Johnson and tell him that the refrigeration system of the store had failed, in order to entice Johnson to come down to the store. Alston testified that during this period he was but two feet from the bandits and that the taller one (later identified as King), during the conversation, removed the handkerchief from his face, so that Alston got a good view of him.

The taller bandit left the room with Hurn to make the telephone call to Johnson. The remaining bandit then ordered the other two clerks to stand with their faces to the wall of the storeroom, and later permitted them to sit down and smoke. Alston testified that during this period he was able to take three or four glances at the bandit who was on guard.

Hurn testified that, after he left the storeroom with the taller bandit, the latter told him to ''cool off'' for a few minutes before making the phone call. During this ''cooling off'' period the bandit smoked a cigarette, and, in doing so, lowered the handkerchief guarding his face, so that Hurn got a good look at him. Under coercion Hurn then telephoned Johnson and told him the story about the refrigeration plant. The bandit ordered Hurn to stand by the door to meet Johnson, threatening to kill Hurn if he made a false move. When Johnson arrived he was admitted by Hurn and immediately the bandit ordered the two, at gunpoint, to go upstairs. Hurn was ordered into the storeroom with the other two clerks, and Johnson was taken by the taller bandit into the office. There, as a result of threats, he opened the two safes, and, upon orders of the bandits, placed their contents in two wastebaskets. It was stipulated that the bookkeeper of the store, if called, would testify that there was $13,300.26 in the safes, of which six to eight thousand dollars was in cash and the balance in checks. During this period this bandit kept his face

partially covered with his handkerchief, but Johnson was able to get three or four good glances at him from a distance of about 10 feet. When the safes were emptied, Johnson started towards the storeroom and the taller bandit started towards the safes. When the two passed, Johnson was able to get a good look at the taller bandit.

The bandits then tied the four men up with tape and rope, during which time Johnson got a fleeting glimpse of, and Hurn got a good look at, the smaller bandit. The bandits then left, taking the money and checks with them. The victims soon freed themselves and called the police.

At the trial Alston, Agrella and Hurn positively identified King as the taller bandit, and Scott as the shorter one. Johnson unequivocally identified King but was unable to identify Scott.

Both appellants attack the evidence of identification. This is their main ground of appeal. Scott correctly points out that all the witnesses testified that the shorter bandit kept his face covered at all times so that his face from his nose to his chin could not be seen. Admittedly both bandits wore hats pulled down low on their heads, obscuring the brows and eyes. The witnesses were all somewhat obscure about the clothing worn by the two bandits. The physical descriptions of the two bandits given by the witnesses to the police generally fit the two appellants, except that such descriptions show that the shorter bandit was afflicted with pimples or pockmarks on his cheeks, and Scott claims that he is free of such blemishes. Scott also claims that the courtroom identifications of him should be given little weight because of the method used by the police in getting the clerks to identify him after his arrest.

The evidence shows that after the two men were arrested, King was identified by the three clerks in a fairly conducted police lineup held in the San Francisco jail where he was taken upon his arrest. But the identification made of Scott, prior to trial, was not conducted in the same manner nor with the same degree of fairness. Scott was brought to the San Mateo jail after his arrest and placed alone in a room. The witnesses were then ushered into an adjoining dark room from which they could see Scott. The witnesses were told that the police had picked up a suspect and wanted to see if the witnesses could identify him; in fact, one of the clerks testified that they were told to go in and identify the man. After this preview, Scott was removed to the county jail, and was placed in a true police lineup. The three witnesses then

came in singly and positively identified him. This procedure certainly subjected the lineup identification of Scott to suspicion. This, however, was a question for the jury. The witnesses unequivocally identified the appellants at the time of trial. They were subjected to searching cross-examination on the identification issue, during which the facts relating to the methods that had been used to secure the original identifications were fully developed. Nevertheless, the jury believed the court made identifications. This created a conflict, the resolving of which was entirely a jury question. The implied findings of the jury on this issue, being supported by credible, substantial evidence, this court cannot and should not interfere.

King's main defense was an alibi. King, his sister, his mother and his half brother testified that King was at home on the night of September 24, 1950, celebrating his sister's birthday. All of the witnesses testified in detail as to the occurrences of that evening and gave reasonable explanations of why they remembered them. Their stories, if believed, would have established a complete defense. But they were not believed. Their truth or falsity was for the jury. Its implied finding that the stories were untrue is binding on this court.

Both defendants made certain express and implied admissions, after being taken into custody, to Inspector Reznik of the San Francisco police department who had been assigned to assist the San Mateo police on the case.

When Reznik questioned King in San Francisco, King stated: "I didn't pull any stickups here." After being identified in the police lineup he refused to explain to Reznik where he had been on the night of September 24, 1950. When questioned about a man posing as a police officer who, after the burglary, searched the home of King's sister presumably looking for the proceeds of this robbery, King immediately stated that Reznik must have been talking to Sherman Arnold, later convicted of murder, and King, thereupon, cursed Arnold for talking. Then King refused to answer any further questions about that episode.

Scott was picked up late in November, 1950, in Los Angeles at the general delivery window of the post office. There is evidence that, after the robbery, he adopted one alias in Los Angeles and another in San Francisco, and that King had visited him in Los Angeles before the arrest. Reznik went to Los Angeles to interview the suspect. He asked Scott if he

knew what case he was being held on (admittedly Scott had not been informed by the Los Angeles police of what case was involved), and Scott answered "I think so." When asked if he thought it was because of Pat King's arrest, he replied "Maybe." He stated that he was living in Los Angeles to get away from certain "characters" in San Francisco, but stated that he was not trying to get away from King, and smiled when asked if he was trying to evade the police. He evaded answering why he was receiving mail at the general delivery window rather than at his apartment, admitted that he had used an alias in Los Angeles, stated that King had visited him in Los Angeles during October, 1950, and claimed that he, Scott, had come to Los Angeles to have a scar removed from his face and to have some dental work done. When asked where he was on the night of September 24, 1950, he answered: "I can't answer that question, Max, until I get up there and see Pat [King]." He claimed to remember where he was that night, but refused to answer when directly accused of being a participant in the burglary. He told Reznik that his brother, who had also been picked up in Los Angeles, was a "good kid" and "doesn't go the same route I do." He admitted that he had known King for about six years, and that King had visited him in the county jail of San Francisco where he was incarcerated prior to the burglary. On the plane returning to San Francisco, Reznik and Scott talked about narcotic addicts and their unpredictable actions. Then Reznik asked Scott "why did you team up with King in this case when you knew he was using narcotics?" Scott replied: "I should have known better. Every time he takes some he flips his lid." Reznik then informed Scott that there would be a lineup at San Mateo when they arrived, and asked what Scott intended to do if identified. Scott replied that if he was identified, he wanted to talk to King, and then "I will get it over with." After Scott had been identified in the lineup he and King were brought together in the presence of the officers. Scott told King how he had been picked up in the post office in Los Angeles, whereupon King called Scott a "chump." Scott refused to further discuss the case and demanded a lawyer.

Sherman Arnold, at the time of the trial a convicted murderer, was called by the defendants as their witness in the hope that he would confess that he and his brother-in-law had committed the crime. Arnold somewhat resembles King, and the brother-in-law has some of the physical characteristics

of Scott. Arnold answered a few innocuous questions but, on the ground that his answers might incriminate him, refused to tell whether or not he had committed the crime here involved. Arnold has since filed an affidavit with this court purporting to admit the commission of the offense here involved, and King has moved that this be considered as new and additional evidence on his appeal. The motion was denied and the affidavit called to the attention of the district attorney, the attorney general, the governor, and the Adult Authority.

In addition to challenging the sufficiency of the identification, an issue already discussed, appellants make other claims for a reversal. They charge that Reznik, after the trial court had ruled in an unreported conference in chambers that certain evidence was inadmissible, constantly referred to that issue in his testimony. This evidence had to do with some money, apparently in the possession of appellants after the burglary. The ruling of the court, its grounds, and the exact nature of the evidence proffered by the prosecution and excluded by the court do not clearly appear, because the proceedings in chambers were not reported. This practice of not having reported conferences involving rulings by the court is not to be commended, preventing as it does the preservation of a complete record. It is clear, however, that on the prior trial Reznik had made many references to this money, and it is equally clear that the trial court on the present trial ruled and informed counsel and Reznik that no reference to this money would be permitted. Nevertheless, the prosecutor, and Reznik, on several occasions, made some reference to this money. Reznik, who was following the transcript from the first trial during his testimony, would volunteer such statements as: ''I am not going to speak of money and I will try to get away from it,'' or that he couldn't ''repeat'' certain conversations because they referred to ''money.'' Once when asked by the prosecutor about a certain conversation had with Scott he stated: ''There I go into the money again,'' and when told by the court to ''leave that cut,'' Resnik asked: ''What are we going to do with all the money?'' A reading of Reznik's testimony indicates that this experienced police officer did bring this money issue into the case on several occasions under circumstances that suggest that he was overly zealous to get this issue before the jury in violation of the court's ruling. This was undoubtedly improper and constitutes error. But on most of the occasions that this occurred, and on all occasions when objection was

made, the court gave a proper cautionary instruction to the jury. Under these circumstances, the error was not prejudicial.

■ Appellant King next complains that he was prevented from reading to the jury a police report previously admitted into evidence. Early in the trial a police report was introduced on behalf of King and used later to check the description of the bandits as given to the San Mateo police by the clerks with the description given at the trial. It was also used during the cross-examination of Johnson to refresh his recollection about which of the four eyewitnesses had given the descriptions to the police. Much later in the trial counsel for King requested permission to read this police report to the jury. The prosecutor objected that such procedure would take time, that the document spoke for itself, and that the jury was entitled to take it into the jury room. The judge then stated that he feared improper inflections that might be placed on certain words if read by counsel, told the jury that they could take the document into the jury room, and denied the request to read it. An examination of this police report shows some discrepancies between the information there contained and the evidence given at the trial, but it also shows that such discrepancies were minor. Whether the document was taken into the jury room or not (it was one of the only two documents, other than photographs, introduced into evidence) does not appear, but it is quite apparent that the fact that discrepancies existed was made fully known to the jury. No request was made to read the document when it was introduced and used in examination, the request coming much later in the trial. Under the circumstances it was within the discretion of the trial court to deny the request.

Appellant King contends that the trial court erroneously admitted, on the theory that this appellant's answers constituted admissions, certain narrative statements of Inspector Reznik that otherwise would have been inadmissible because of the hearsay rule. This practice of using conversations between the police and the suspect in which narrative statements are made by the interrogator containing what otherwise would be inadmissible hearsay in order to secure an admission, at least where a claim of privilege is made, has recently been condemned by the Supreme Court. (*People* v. *Simmons*, 28 Cal.2d 699 [172 P.2d 18].) In that case the court stated (p. 717) : "Another objection to this form of evidence is that there is placed before the jury under the guise of an accusatory statement a vast amount of hearsay testimony otherwise

utterly inadmissible. Lengthy statements are taken by the police from third persons who may or may not thereafter be witnesses. . . . The defendant, under arrest, is then asked to read the statement. If it contains indications of his guilt and he responds with other than a flat denial, the statement is then put in evidence as an accusatory statement. Although the jury may properly be cautioned to receive it, not as substantive evidence in proof of the facts asserted but merely as a basis of showing the reaction of the accused to it, the fact is that a lengthy transcript containing any amount of extraneous matter apart from the direct accusation is read into the ears of the jury and the matter remains in their mind during their deliberations.''

While the precise holding of the cited case was that such statements should be barred when they are responded to with a claim of privilege, there is a dictum to the effect that without reference to the reply of the accused, accusatory statements and responses thereto should be viewed ''with great caution,'' and should be excluded ''if the police questioning has been insistent'' or ''if it appears that a great mass of extraneous hearsay matter will be placed before the jury through this device . . . unless, at the time of questioning, the defendant has been clearly advised that his reaction can be held against him as an admission.'' (Pp. 718-719.)

We have carefully examined the testimony of Reznik as to these conversations, not only as they relate to King but also as to Scott. Undoubtedly some hearsay that would otherwise have been inadmissible, was thus introduced into evidence. But such examination discloses that the examinations here involved were neither lengthy nor insistent, and the defendants were correctly advised of their rights before the questioning started. The trial court correctly instructed on the limitations of such evidence.

It should be pointed out also that in the Simmons case, where the accused when questioned claimed his privilege, and where the. otherwise inadmissible hearsay thus admitted was much more extensive than is here involved, the court held the error, under the facts, to be nonprejudicial. Moreover, Mr. Justice Shenk, in a concurring opinion, in the Simmons case, pointed out that before such error will be considered, a proper objection must be made in the trial court (p. 723), and this view has been followed in two appellate court cases. (*People v. Stepp*, 82 Cal.App.2d 49 [185 P.2d 417] ; *People v. Showers*, 90 Cal.App.2d 248 [202 P.2d 814] ; see, generally, on this en-

tire subject, *People* v. *Peterson*, 29 Cal.2d 69 [173 P.2d 11] ; *People* v. *McGee*, 31 Cal.2d 229 [187 P.2d 706] ; *People* v. *Bob*, 29 Cal.2d 321 [175 P.2d 12].) Whether proper objections were here made does not clearly appear because some of the objections and rulings were made in unreported conferences in chambers. But, if it be assumed that proper objections were made at the trial, and even though there may have been some minor errors in the rulings, there was nothing that approaches the errors discussed in the Simmons case. If the errors there were not prejudicial, they could not possibly have been prejudicial in the present case.

 Appellants also complain of the proof by the prosecution that prior to the burglary Scott had been incarcerated in the county jail, and of the prosecutor's comment thereon. This evidence and comment were to the effect that some time before the burglary Scott had been in the county jail, and that King had visited him there and picked him up upon the completion of his term. This evidence was properly admitted to show the friendly relationship that existed between the two defendants, and the fact that the place of meeting was the county jail was incidental. The jury was carefully and properly instructed that such evidence should not be considered in ascertaining the character of the defendant Scott. Moreover, during the trial, counsel for both defendants stipulated that if a designated jailer were called as a witness he would testify that King visited Scott five or six times while the latter was incarcerated, and called for him upon his release. King's counsel, in interrogating his client, voluntarily brought out the fact that King visited Scott while the latter was serving six months for passing a bad check. Under these circumstances, there was no error in the admission of this evidence.

 Scott next complains of the admission of evidence that after the burglary he had twice used an alias, once in San Francisco and once in Los Angeles. No objection was made at the trial to the introduction of this evidence. There are several cases holding that evidence of use of a fictitious name, when objected to, cannot be shown against a defendant in a criminal case, at least on cross-examination of the defendant, because it unduly degrades the defendant. (*People* v. *Mohr*, 157 Cal. 732 [109 P. 476] ; *People* v. *Fleming*, 166 Cal. 357 [136 P. 291, Ann.Cas. 1915B 881] ; *People* v. *Frank*, 71 Cal.App. 575 [236 P. 189].) However, in a later decision in the Frank case (75 Cal.App. 74 [241 P. 924]) the court

explained its prior holding as merely being a limitation on the cross-examination of defendant. The court stated (p. 77) : "Under these circumstances there was no error in admitting the evidence complained of, as his statement giving a false name was made after the offense had been committed and evidently with knowledge on appellant's part of its commission. It must be considered in connection with and as a part of his attempted flight after he, with a stolen pin in his possession, found himself in the presence of the officers of the law. As was said in *People* v. *Cox,* 29 Cal.App. 419, 422 [155 P. 1010, 1011], 'when a person suspected of and charged with crime resorts to deception and falsehood, that is a circumstance which, like flight and concealment, tends to show a consciousness of guilt, . . . arising from other established facts.' "

Certainly, even if such testimony should be excluded, timely and proper objection must be made. (*People* v. *Williams,* 72 Cal.App. 52 [236 P. 355] ; see, generally, *People* v. *Pedone,* 35 Cal.App. 452 [170 P. 170].)

On the trial King testified on his own behalf, but Scott did not. The prosecution twice briefly commented on Scott's failure to testify. ██ Although the record does not show that such an instruction was offered, appellants complain of the failure of the court to instruct on its own motion that failure to deny or explain damaging evidence does not warrant a presumption or inference of guilt. Undoubtedly such an instruction, if offered, should have been given, and its refusal would have been error. (*People* v. *Adamson,* 27 Cal. 2d 478 [165 P.2d 3] ; *People* v. *Greenberg,* 73 Cal.App.2d 675 [167 P.2d 214].) But in both the cited cases the error was held not to be prejudicial. In the Adamson case (p. 490) the following was stated:

"The jury, however, is concerned with the scope and nature of the consideration that it may give defendant's failure to explain or deny incriminating evidence, and in the present case should have been instructed that the defendant's failure to deny or explain evidence presented against him does not create a presumption or warrant an inference of guilt, but should be considered only in relation to evidence that he fails to explain or deny; and that if it appears from the evidence that defendant could reasonably be expected to explain or deny evidence presented against him, the jury may consider his failure to do so as tending to indicate the truth of such evidence and as indicating that among the inferences that may

reasonably be drawn therefrom, those unfavorable to the defendant are the more probable.

"The failure to give such an instruction was not prejudicial, however. It appears from the evidence that defendant could reasonably be expected to explain or deny all evidence presented. . . . His failure to explain or deny this evidence by his testimony could have been considered by the jury as indicating that the evidence was true and that the inferences unfavorable to the defendant were the more probable." Thus, even if it was error for the trial court not to have instructed on this issue even in the absence of a proffered instruction, such error could not have been prejudicial.

Scott also complains of the failure of the court to instruct the jury on the effect of flight as required by section 1127c of the Penal Code. That section provides that where flight is relied upon as tending to show guilt "the court shall instruct the jury substantially as follows:

"The flight of a person immediately after the commission of a crime, or after he is accused of a crime that has been committed, is not sufficient in itself to establish his guilt, but is a fact which, if proved, the jury may consider in deciding his guilt or innocence. The weight to which such circumstance is entitled is a matter for the jury to determine." The evidence shows that after the burglary Scott went to Los Angeles to live. When the prosecution, in its argument to the jury, sought to characterize this change of residence as "flight," and started to say "the Court will, I believe, instruct you that flight can be taken into consideration by you——" counsel for appellant objected to the characterization as "flight," and the court thereupon stated that it would not give an instruction on that subject. Under these circumstances it is hard to see how any error was committed. The instruction, if given, would have been adverse to the interests of this appellant. The refusal to give it could not have been prejudicial, but was in fact favorable to appellant.

Other minor contentions are made. None requires comment. This case turns upon the identification of the two defendants by the victims of the burglary. That identification, at the trial, being positive and clear, and having been believed by the jury, the minor errors that occurred could not possibly have been prejudicial.

The judgment appealed from is affirmed.

Bray, J., and Wood (Fred B.), J., concurred.