[Crim. No. 133. Fourth Appellate District.—January 20, 1932.]

THE PEOPLE, Respondent, v. GEORGE TROTTER et al., Appellants.

Joseph C. Saylor and Claude Minard for Appellants.

U. S. Webb, Attorney-General, and Alberta Belford, Deputy Attorney-General, for Respondent.

MARKS, J.—Appellants and James Musacchio were charged with the crime of murdering Edward Nunes on June 27, 1931, in Fresno County. The jury returned verdicts finding them guilty of murder in the first degree, fixing the penalty at imprisonment for life in the state

penitentiary. Appellants made separate motions for new trials which were denied. From these orders and from the judgments thereafter pronounced upon them they have each appealed to this court.

Appellants with great earnestness and sincerity urged, both in oral arguments and in their briefs, that the evidence was insufficient to support the judgments, and that both were innocent of the crime of which they stand convicted. We have carefully studied the entire record which discloses the circumstances leading up to and surrounding the killing of Edward Nunes to be as follows: Edward Nunes was the proprietor of a service station situated about twenty miles from Fresno on the Whites Bridge road in Fresno County. The service station building contained four rooms, a living-room, bedroom and a kitchen which furnished deceased his living quarters, and a room which he used as a store and in which he kept a small stock of cigars, tobacco and other merchandise. Some little distance to the rear of the service station was a garage, and further to the rear was a small building which he used for the purpose of brewing beer. On June 27, 1931, there were a number of cases of beer stored in this house together with brewing and bottling apparatus, empty bottles and cartons. Nunes had been engaged in the unlawful manufacture and sale of beer for some time prior to his death.

In the late afternoon of June 27, 1931, the appellants and James Musacchio, mutual acquaintances, met in the city of Fresno. Alvarez told Trotter that Nunes owed him some money and asked Trotter to take him to Nunes' service station in his automobile. Trotter told Alvarez that his car was not in running condition. Alvarez said that he had friends who would fix the car so it could be run. The three defendants started for Nunes' service station early in the evening of June 27th. They encountered difficulties in operating the automobile and arrived at their destination at about 11 o'clock on that night. Trotter drove the automobile with Alvarez sitting beside him and Musacchio on the rear seat. When they reached a point on the Whites Bridge road nearly opposite the service station, Trotter reduced the speed of the car and Alvarez swung off its running-board on to the road. The other two went on down the road a short distance westerly. Musacchio

then told Trotter to turn around and return to the station which he did, stopping his automobile near the house in which the beer was stored. Nunes was not at home. The three defendants entered his living quarters by opening a closed door into the kitchen. They drank several bottles of beer which they found in the ice-box. They then went to the small building in the rear, opened it and loaded six or eight cases of beer into the automobile. Trotter then drove it across the Whites Bridge road and into a vacant field stopping it several hundred feet from the road. He returned to Nunes' living quarters where the three consumed more beer and waited for Nunes to return. During this time a handkerchief or cloth was tied loosely around Trotter's neck, and Musacchio tied a handkerchief around his neck. Alvarez testified that during the ride and the wait for Nunes he had a handkerchief tied around the lower part of his face. The facts thus far narrated are not seriously denied by either of the appellants.

After the three had waited some considerable time, Nunes returned. He drove to the rear of the service station with his lights turned on the kitchen door. Trotter was in an adjoining room. Nunes entered the kitchen door and was met by Alvarez standing on one side of it and Musacchio either on the other side or in front of it. According to some of the evidence Nunes was met by a command to "stick 'em up". He grappled with Musacchio who was armed with a revolver. Nunes was shot through the abdomen. He wrested the weapon from his assailant and discharged the remaining cartridges into the walls of the building and struck Musacchio over the head with the gun. When the struggle began Trotter dove out of an open window and through a screen covering it and made his escape. Alvarez went out of the kitchen door and took Nunes' automobile in which he drove to Fresno. Musacchio made his way back to Fresno on foot.

It is the theory of respondent that the three defendants conspired together to steal Nunes' beer and burglarize his service station; that in carrying out this plan Nunes was shot and killed by Musacchio thereby making all of the defendants guilty of murder in the first degree. Musacchio did not move for a new trial and did not appeal from the judgment pronounced upon him.

Alvarez, in several extrajudicial statements which practically amounted to confessions freely and voluntarily given, admitted that he with the others went to the service station for the purpose of stealing the beer; that after the beer had been loaded in Trotter's automobile the three went into Nunes' living quarters and there waited for his return to "hold him up and rob him". Various officers of Fresno County testified that the service station and Nunes' living quarters had been thoroughly ransacked. Each of the defendants admitted entering the living quarters and drinking Nunes' beer. Upon his own statements which were repeated on several different occasions and were voluntarily made there can be no doubt of the guilt of Alvarez.

Trotter at all times denied any knowledge of any intent on the part of any defendant to steal Nunes' beer or to burglarize his service station or to "hold him up and rob him". He claimed that Alvarez told him and Musacchio that Nunes owed Alvarez money; that Alvarez had asked Nunes for this money on the afternoon of June 27, 1931; that Nunes could not then pay and told Alvarez to go to the service station late on the evening of June 27th, where he would give him some beer on account of the debt and pay him part of the money which he owed him. Trotter testified that on the trip to the service station Musacchio drew a pistol and told him that if he did not drive to the service station his (Trotter's) lights would be put out; that he was menaced by this pistol during the latter part of the trip; that when he drove to the rear of the service station he found Alvarez armed with a shotgun and was forced by his co-defendants to assist in loading the beer and to drive to the vacant field across the Whites Bridge road. He maintained that the cloth, which was apparently a mask, was tied around his neck by one of his co-defendants; that he left the service station and the company of his co-defendants through the open window as soon as the scuffle between Nunes and Musacchio had commenced. His defense may be summarized by the statement that at the commencement of the trip to Nunes' service station he had no idea of its unlawful purpose and that as soon as this purpose was disclosed he was compelled against his will to participate in the enterprise by the show of armed force on the part of his companions which was sufficient to cause him to fear his instant death if he at-

tempted to withdraw. He maintained that he withdrew upon the first safe opportunity presenting itself. He further stated that after the escape he walked about five miles to the home of a friend and told him that his automobile had been stolen and asked to be taken into Fresno. As this friend did not take him to Fresno he asked the privilege of sleeping in his house. He went to bed and awoke about noon on June 28th. Upon arising he repeated his assertion that his automobile had been stolen and again asked to be taken into Fresno to report its loss. One of the parties present consented to make the trip and started with Trotter to Fresno. On the way they met a traffic officer whom Trotter stopped and told the story of the loss of his car. This officer took Trotter into his machine and took him to Fresno. On the way Trotter admitted being present at Nunes' service station the night before and for the first time gave as his reason for being there the story of the force used on him by the other defendants. This story was repeated with some variations on numerous occasions thereafter. It contains many inconsistencies.

Under this state of the record Trotter maintains that there was no evidence of his voluntary participation in the criminal undertaking of his co-defendants; that he was compelled to participate by a force which created in him a reasonable fear of the loss of his life and that therefore he was not guilty of the crime charged.

There is evidence of Trotter's presence with his companions during the commission of the crime of stealing Nunes' beer and burglarizing his home. There is no sufficient explanation of why he remained at the service station and engaged in frequent drinking bouts with his companions consuming large quantities of Nunes' beer. The three waited for Nunes' return for a considerable time and Trotter evidently made no real effort to escape until about the time Nunes was shot. The testimony of a number of witnesses clearly indicates there was a thorough search of Nunes' house for valuables before he returned. This alone should have acquainted Trotter with the felonious intent of his companions. The fact that the three of them wore masks when Nunes entered the kitchen is a circumstance showing guilty knowledge and guilty intent on the part of Trotter. His story that his presence during the commission

of the crimes at the service station was involuntary on his part and solely under fear of death at the hands of his companions, merely created a conflict in the evidence and tended to contradict the strong circumstantial evidence against him. This conflict was addressed to the jury and was resolved against Trotter.

Trotter made one serious lapse in his rather fantastic story in defense of his innocence. This occurred during the interrogation of James Musacchio in the presence of Alvarez and Trotter in the county jail in Fresno on the twenty-eighth day of June, 1931. The following very important admissions by Alvarez and Trotter appear in the record: "Q. (By Deputy District Attorney Walton.) How did you get those scars upon your face? A. (By Musacchio.) I fell off the stairs, fell up the stairs. Q. When? A. The other day. Q. What stairs? A. About my house. Q. What day was it? A. This is Sunday? Or Monday? Q. This is Sunday, past Sunday. A. Well, I imagine about Saturday, I guess. Q. Fell off the stairs? A. Yes, sir. . . . Q. Fell— I will tell you how you got them. Ed Nunes did it with the pistol, he rapped you with the pistol, that is what he said, out at his place Saturday night. Now I am going to tell you what these boys said about it, just in order to be fair with you, before you tell me your story about it. Alvarez says you went with this man Two Bits Saturday night, and Alvarez and you made the proposition to him to go out and hijack Nunes's booze, and Two Bits took his car and you and Alvarez went out with Two Bits, loaded up Alvarez' (Trotter's) car and went in the house and drank beer until Nunes come home. . . . Q. Is that—that is right, isn't it, what I have told you? Raymond Alvarez: Yes, sir. . . . Mr. Walton: Right, isn't it, Two Bits? Two Bits: Yes Sir." Two Bits was a nickname by which George Trotter was known in Fresno and which was used in questioning him on this occasion.

■ Appellant Alvarez complains of the admission in evidence of statements of Edward Nunes as dying declarations. He maintains that at the time they were made Nunes was not *in extremis* and had not abandoned all hope of life.

Dr. J. C. Drake was called to the service station to administer to Nunes. This witness told his patient that his intestines were terribly torn; chopped all to pieces; that he

would probably live no more than two days; that he might collapse in the ambulance on the way to the hospital. He asked Nunes if he had any relatives to be notified and if he desired the doctor to prepare his will. Nunes replied "No, it is no use. . . . Everything is mortgaged and I haven't anything anyway. . . . I am going to die; I know it will kill me." A further statement was taken from Nunes after he reached the hospital in Fresno shortly after 5 o'clock in the morning of June 28th, about thirteen hours before his death. Before making this statement Nunes was asked if he thought he was going to die to which he replied that he did.

██ We have concluded that the trial court properly admitted the dying declarations in evidence under the rule announced in *People* v. *Singh*, 182 Cal. 457, at page 476 [188 Pac. 987, 995], as follows: "The weight of authority in respect to the relative functions of the court and the jury touching the admission and determination of dying declarations is that the court alone shall pass on the admissibility of this character of evidence, and that the jury shall exclusively determine its probative value. (56 L. R. A. 434; 16 L. R. A. (N. S.) 660; 52 L. R. A. (N. S.) 152; 4 Ency. of Evidence, 947.) Whatever the law may be in other jurisdictions, it is well settled in this state that it is the function of the trial court primarily to pass upon the admissibility of the alleged dying declarations and of the jury to determine whether they were in fact made under a sense of impending death, and, if so, then to determine the credibility and weight to which they are entitled. If the jury is not convinced beyond a reasonable doubt that the declarant was *in extremis* and believed at the time that he was, they must, in arriving at their verdict, disregard such declarations. But if, on the other hand, the jury are satisfied beyond a reasonable doubt that the declarant acted under a sense of impending death, they must then determine what facts, if any, are established by his declarations and apply them accordingly. (Citing cases.)"

██ Alvarez further complains that the trial court erred in not instructing the jury on manslaughter and on murder in the second degree. An examination of the record discloses that instructions were given on both these subjects, and, that the questions of the guilt or innocence of the

defendants of murder in the first or second degree, or manslaughter, were submitted to the jury.

▪ Both appellants complain of the court's ruling in admitting in evidence statements made by one defendant after the commission of the crime and not in the presence of the other defendants. The record shows that the trial court was extremely careful in instructing the jury on each occasion that the statement of one defendant not made in the presence of another could be considered only against the defendant making it and not against any absent defendant. The district attorney also repeatedly stipulated that such was the law and requested the court to so instruct the jury. This brings the case within the rule announced in *People* v. *Burdg,* 95 Cal. App. 259 [272 Pac. 816, 820], as follows: "It is true, the prosecution was allowed to introduce in evidence at the joint trial extrajudicial declarations made by the respective appellants out of the presence of the other, but this situation of itself does not give defendants jointly charged the absolute right to separate trials, because if such were the rule then in no case could there be a joint trial when part of the evidence against the joint defendants consisted of extra-judicial statements; furthermore, in the present case, the record discloses that in admitting said declarations the trial court in each instance carefully and properly instructed the jury to the effect that the rights of the absent party were to be in no way affected thereby; and we must presume, in the absence of a contrary showing that the jury followed those instructions. (*People* v. *Prather,* 134 Cal. 436 [66 Pac. 589, 863].)"

▪ Appellant Trotter complains of the admission in evidence of extrajudicial statements of Alvarez, made in the presence of Trotter but denied by him, in which Alvarez accused Trotter of complicity in the murder. Many of the accusatory statements so made by Alvarez were not denied by Trotter. Some were admitted by him to be true. This brings the instant case without the rule announced in the case of *People* v. *Goltra,* 115 Cal. App. 539 [2 Pac. (2d) 35]. Where parts of an accusatory statement made in the presence of a defendant, directly tend to prove his participation in a crime with which he is charged, and which

are not denied by him, are admitted in evidence, there is no prejudicial error in admitting the entire statement.

It is not necessary to further extend this opinion by considering the other assignments of error. There is no merit in them. Appellants were fairly tried and convicted upon sufficient evidence.

The judgments and orders appealed from are affirmed.

Barnard, P. J., and Jennings, J., concurred.