[Crim. No. 1004. Fourth Dist. Jan. 3, 1955.]

THE PEOPLE, Respondent, v. JAMES GARROW, JR.,
Appellant.

James Garrow, Jr., in pro. per., for Appellant.

Edmund G. Brown, Attorney General and Norman H. Sokolow, Deputy Attorney General, for Respondent.

GRIFFIN, J.—Defendant was charged in one count with grand theft of a Cadillac automobile; in a second count with burglary with intent to commit theft; in a third count with violating section 12021 of the Penal Code in possessing a

firearm (22 caliber automatic) having been previously convicted of a felony; and with a prior conviction of a felony (Dyer Act, title 18 U.S.C.A. § 2312) and having served a term therefor in a penal institution.

Defendant, represented by court-appointed counsel, pleaded not guilty to the three counts, and admitted the prior conviction. A trial by jury resulted in a conviction on the second and third counts and a verdict of not guilty on the first count. In propria persona defendant appealed from the judgment of conviction and filed a 49-page typewritten brief. He recites many contentions why the judgment should be reversed.

The first contention, as we construe it, is that the counsel appointed by the court to represent defendant at the trial was "obviously disinterested and inadequately prepared" to conduct defendant's defense, and that the court erred in not recognizing this fact and not replacing him with another attorney. Much of defendant's argument, in this respect, is based upon conclusions of the defendant, upon alleged statements claimed to have passed between defendant and his counsel which are not a part of the record, in failing to call certain witnesses, and in failing to sufficiently point out to the jury certain claimed inconsistencies in the evidence, particularly between the testimony of the defendant and that of the prosecution witnesses. Suffice it to say, we have examined the entire record before us and find nothing that would indicate to us that defendant's counsel had not thoroughly defended the action, had not sufficiently cross-examined the witnesses, or failed to bring out the material facts that were obtainable. There was no sufficient showing that the testimony of the witnesses desired would be of any particular value or would be material to defendant's defense to the crimes of which he stands convicted.

The witness about which the main complaint is made, although subpoenaed by defendant's counsel, was not in court due to serious illness, and it was agreed between respective counsel that a delay of the trial was unnecessary since they were willing to stipulate as to what the testimony would be. Apparently no stipulation was entered into and no further need of the testimony was indicated at the close of the trial. Defendant made no objection to this fact at that time. Defendant's own version as to what the witness would have testified at the trial would have been but cumulative and would furnish no material evidence of defendant's innocence

of the offenses for which he suffered conviction. If defendant felt his counsel did not adequately represent him he should have complained to the trial judge and given him an opportunity to correct the situation. An examination of the entire record indicates that the defendant was fairly represented by the counsel appointed to defend him. (*People* v. *Youders*, 96 Cal.App.2d 562 [215 P.2d 743].)

The evidence produced at the trial is voluminous and is somewhat in conflict. William Meyers, the complaining witness, just purchased a beer bar (Red Onion) in Coronado, from one Whiteside who was still occupying a sleeping room upstairs over the bar. In the barroom was a closed door leading to a stairway proceeding up to this room. The door was unlocked on most occasions. About Wednesday, or Thursday, December 17, 1953, defendant came to this bar and engaged in conversation with Meyers. He told him he was a bartender and was going to work for one Olson across the street; and that Olson was out of the city. Defendant stated that he was sleepy and Meyers, according to his testimony, told defendant he did not believe that Whiteside would mind if he used his bed for an hour or so. Apparently defendant did this. It appears that Whiteside came into the bar about that time and Meyers told him what he had done and Whiteside seemed agreeable. After defendant awakened he came downstairs and borrowed $6.00 from Meyers and left for Los Angeles and returned the next day and repaid it. Meyers testified that around noon on Saturday he and his wife and defendant went to San Diego and purchased some beer glasses; that his night bartender wanted a night off so he, Meyers, decided to work for the bartender; that defendant was sitting around the place waiting for Olson to return and defendant asked Meyers if he could help out and that he did so until about 1 a. m.; that Mrs. Meyers took the cash from the register, put it in a money bag and hid it under some bottles in the cooler and closed the establishment. Apparently Meyers gave defendant permission to sleep in the barroom that night. On Sunday morning the Meyers came from their residence a few blocks away, opened the bar, and defendant was there lying on a cushioned bench with blankets on him. After some time, Meyers indicated that he would like to have a duck dinner that day and asked defendant to go down the street and see if he could buy one for him. Meyers gave him some money and defendant left. He could not find one and suggested that he thought he could obtain one near

Chula Vista if he had a way to get there. Meyers loaned defendant his Cadillac car for this purpose. Defendant left about 11 a. m. and returned at 1:30 p. m. and delivered the duck to Meyers at his home. They dressed it and put it in the oven to cook. Defendant obtained a one-half pint bottle of liquor and the two of them mixed some drinks. Meyers said he was becoming bored with defendant's presence and suggested that he return to the Red Onion and see if the night bartender came to work at 6 p. m., on time. Defendant returned to Meyers' house and ate some of the duck dinner with the Meyers and a Mrs. Warwick. Later, at Meyers' request, defendant was taken uptown by Mrs. Warwick and the Meyers retired. It appears that defendant went back to the Red Onion and engaged in conversation with the night bartender; that the bartender had some urgent reason to leave and asked defendant to tend bar and close up for him because he had seen him there on the previous night and knew he was friendly with the Meyers. Defendant tended bar. Two girls came into the bar about 10 o'clock and they agreed with defendant that business was slow and that they would lock up the bar and, with one other boy, go to Tijuana. Defendant said he had the use of a Cadillac and would meet them across the street. Apparently, defendant went to the Meyers residence and took the Cadillac. He had the keys with him as well as the key to the barroom which were on one key ring. It appears that either that evening or the night before defendant went up into the Whiteside bedroom, wrapped up his clothes, picked up an Italian Baretta (22-caliber automatic) which was hidden on the shelf in that room, and also took four boxes of shells to fit this gun. Defendant had been shown this gun by Whiteside on a previous occasion when defendant was in that room. He also took the money from the bar register consisting of about $145 in change and paper bills. Meyers testified he did not give defendant permission to relieve the bartender, to close the bar, to take the cash, to enter the bedroom of Whiteside, to take the automatic, or the automobile.

About 5 a. m. on Monday, December 21, Meyers was awakened by a police officer. Later, his car was returned to him from the Tijuana border. Meyers went to the Red Onion, examined the register, and looked for the previous day's receipts but they, as well as the money bag, were gone. Apparently defendant drove the Cadillac to Tijuana with the occupants. After several drinks at various bars defendant

told his guests he needed gasoline for the Cadillac. He said he wanted to buy it on the American side, so he crossed the border and being unable to find a station open, started back to Tijuana and was stopped for inspection by a deputy sheriff who, observing the absence of an ownership certificate on the car, inquired of defendant as to the title to the Cadillac. Defendant gave the name and telephone number of Meyers, said he was employed by him, and asked the officer to call him. They unlocked and looked in the glove compartment for the certificate and found the 22-caliber automatic gun. Whiteside had retained the clip from it in his pocket and accordingly it would only fire one shell at a time. The officer inquired of defendant as to the ownership of the gun and he told him it belonged to a friend of his; that they had been out shooting and his friend had left the gun in that compartment. He denied having any shells for it. Defendant's personal clothing was on the back seat, as well as a bank money bag containing about $47 in silver. Defendant said it belonged to the bar where he worked; that he had the rest of the money in his pocket. Forty dollars in bills were produced. While defendant was in the patrol office he said he was feeling ill and wished to retire to the rest room. Therein the officer noticed defendant throw paper towels in the trash can, dangle his left arm over it, and then throw more towels in it. The trash can was examined and four boxes of 22-caliber shells were found, as well as a pair of dice. Defendant denied knowledge of the shells. Later, he stated the first knowledge he had of the gun was when it was on the back seat of the car.

Defendant's story of the trip to Tijuana and of the good time they had there was corroborated by one of the party. She testified she did not see any gun on the back seat or any other place in the car; that defendant did not return for them and they were required to find their own way back to Coronado.

Whiteside testified that on Saturday morning he talked with defendant and they became interested in guns and shooting in general; that he showed defendant this gun which he kept on the top shelf of a little closet of the room he occupied; that defendant was present when he took it down; that he had seven boxes of shells for it; that he told defendant he could keep his clothes in that room and that he gave him some blankets and said if he could find a place to sleep it was all right with him; that defendant slept in a booth down-

stairs in the bar and that he, Whiteside, slept in his room. He then testified that he made a check on Monday, about 12:30 a. m. and found the gun and four boxes of shells missing; that he had been away from his room from early Sunday afternoon until 12:30 Monday morning; that he did not give defendant permission to stay in the room following the discussion about the guns because he had only a single bed in it and he thought defendant did not want to stay there. He testified he never gave defendant permission to take the gun.

Defendant's story at the trial was that it was Wednesday, December 16th when he first saw Meyers and used Whiteside's room for a few hours; that he returned to Los Angeles to receive some money to repay Meyers his $6.00 and stayed Friday night at the Red Onion; that he and Meyers reached a tentative agreement about defendant going to work for him and he was to use the Whiteside bedroom when he moved out; that he and Meyers became quite definite friends; that he worked Saturday evening for Meyers tending bar, and that Meyers showed him where he kept the money overnight; that the next day Meyers spoke about wanting a duck and let him use his car for the purpose of securing one; that he returned to Meyers' home and drank with him and Meyers fell asleep; that, at Meyers' request, he drove to the Red Onion in Meyers' car to see if the night bartender had come on duty; that he had Meyers' car keys with him in his pocket; that he returned, had dinner with them, and a Mrs. Warwick later took him back to the Red Onion; that he went there and asked the bartender to draw some money for him because he had paid for the duck for Meyers and was a little short of cash; that he signed a chit for $10 and assured the bartender it was all right with Meyers; that the bartender left early and left defendant in charge; that the girls came in and they planned the trip; that he took the till money to Meyers' home to leave it but the lights were out and he did not want to disturb them; that he "borrowed" the car because he thought about anything he would do would be all right with Meyers; that while in Tijuana he had already spent the $10 he had "drawn" and drew another $10 to buy gasoline, etc.; that in recrossing the border line the officers discovered the "canon" in the glove compartment, and it disturbed him because he had a prior affair and that the law authorities frown on people having dangerous weapons under those circumstances; that he was somewhat intoxicated and, realizing he had a few boxes of shells

in his pocket, he dumped them into the waste basket; that he did not know there was a pistol in the glove compartment; that he did not intend to steal anything and that at the time he entered the bar or the room occupied by Whiteside, he never intended to steal anything or commit any_felony. He claimed that Meyers testified against him as he did because defendant had threatened a false arrest suit against him and accordingly Meyers testified falsely against him. Defendant admitted the Whiteside gun was quite valuable and that he should have asked Meyers if he could borrow his car that night, but claimed he was in the Whiteside room that night to get his clothing; that he was going to take it to the Meyers' home to have it sent out with their laundry. He testified he did not take the gun that night but did take it and four boxes of shells, without Whiteside's permission, from his room on Sunday, about 11:30 a. m.; that he took it in connection with Meyers' suggestion that he get a duck; that he drove down the bay shore and saw a few ducks on the water and decided they. were too far out to hit with that weapon so he went on to Chula Vista and bought one; that by that time he was sober enough to realize it was out of season and it was not just the thing to do, so he returned the gun to the glove compartment and locked it; that he did not recall telling the officers he was out hunting with a friend.

Meyers denied making any arrangements with defendant about hiring him and using the living quarters; denied he ever authorized defendant to operate the bar for his bartender, to take any money, or replace it with chits.

In defendant's brief he reiterates this same story with a few additions and concessions, and maintains that at the time charged he had no custody, possession or control over the pistol in the glove compartment because it had been there since Sunday morning, and the car had been in the possession of Meyers since that time; that defendant's testimony is "above reproach" and plaintiff's witnesses' testimonies were, in numerous instances, "falsifications and outrageous distortions of fact."

These claimed variances and contradictions in the testimony afforded an opportunity for a persuasive argument to the jury against the reliability of such witnesses. ▆▆ We cannot disturb the findings of the trier of facts unless we can justly conclude that the entire testimony of the witnesses is *per se* unbelievable. (*People* v. *Boyce,* 99 Cal.App.2d 439, 443 [221 P.2d 1011].) No such situation is here presented. The question for the appellate court to pass upon is whether

there was evidence in the record justifying the inference of guilt. We will therefore now consider the question of the sufficiency of the evidence to support the charge of burglary. The jury found it to be burglary of the first degree and the trial court reduced it to burglary of the second degree.

Section 459 of the Penal Code defines burglary as follows:

"Every person who enters any house, room, apartment, . . . with intent to commit grand or petit larceny or any felony is guilty of burglary."

It readily appears, at the time defendant entered the Whiteside room to take the gun and shells, which he admittedly took, he may well have entered it with the intent to commit theft of the gun at that time, even though on other occasions, he may have had passive permission to use the room for the purposes indicated. ■ It has been held that where a person enters a house in pursuance of an express invitation of the proprietor, if he nevertheless enters with the intent to steal, he is guilty of burglary. (*People* v. *Lowen,* 109 Cal. 381 [42 P. 32]. See also *People* v. *Brittain,* 142 Cal. 8 [75 P. 314, 100 Am.St.Rep. 95]; *People* v. *Barry,* 94 Cal. 481 [29 P. 1026]; *People* v. *Young,* 65 Cal. 225 [3 P. 813]; and 4 Cal.Jur. 718, § 3.) Of course, if at the time defendant entered the room, as contended by him, he entertained no intent to commit theft therein, or if such intent subsequently arose, no offense of burglary was made out. However, from the circumstances related, the evidence produced, and the inferences that may be reasonably drawn therefrom, the jury was justified in not believing defendant's story and in finding him guilty of that charge.

The serious question presented involves the instruction of the trial judge bearing on this very question. While the original instructions given to the jury are not made a part of the record on this appeal, we will assume from the transcript that the definitions of grand theft and burglary were given in the language of the statutes. After the jury retired it returned for further instructions and the following colloquy took place between its foreman and the judge:

"THE JURY FOREMAN: . . . I believe you said there were two points to be decided on the grand theft auto and the burglary charge before we could render a verdict of guilty or not guilty. We would like to have those two points restated, . . . mainly the act of taking and the intent.

"THE COURT: Well, in the case of grand theft you have to have the intent permanently to deprive the owner of his prop-

erty. In burglary you have to have the specific intent to enter a room or house, or any building, and so forth, with the intent therein to commit the crime of theft, or any other felony.

"Is that sufficient?

"THE JURY FOREMAN: Does the point intent with regard to burglary also include the provision of permanent possession?

"THE COURT: No.

"THE JURY FOREMAN: As it does in the case of the car theft?

"THE COURT: No. The specific intent on a charge of burglary is the specific intent to enter a building or room, and so forth, with the intent therein to commit the crime of theft, or any other felony.

"In grand theft the specific intent there must be permanently to deprive the owner of his property.

"THE JURY FOREMAN: That satisfies us. Thanks."

█ It would appear to us that since the jury retired and returned a not guilty verdict as to the grand theft count, it was led to believe from the instructions given that it was not necessary on the burglary charge to show that at the time defendant entered the room he intended to permanently deprive the owner of certain property therein by theft. If so, it would be an erroneous construction of the law. (*People* v. *Lamey*, 103 Cal.App. 66 [283 P. 848].) █ In addition to the specific intent to enter the building there must also be a specific intent to *commit theft therein*. The definition of theft in that case is the same as it would be in any other case, including the count pertaining to the Cadillac. It is true that it is not necessary to show that the defendant actually took anything, but there must be a showing that he intended to commit theft therein when he entered.

In *In re Connell*, 68 Cal.App.2d 360 [156 P.2d 483], it was held that to constitute the crime of larceny an intent to steal is essential, and it must be an intent wholly and permanently to deprive the owner of the property. This intent must exist at the time of the taking.

In *People* v. *Brown*, 105 Cal. 66 [38 P. 518], it was held that where a defendant is accused of the crime of burglary committed in entering a house with intent to commit grand larceny, it is necessary that the felonious intent must be permanently to deprive the owner of his property, and an instruction that larceny might be committed even though it was only the intent of the party taking the property to deprive the owner of it temporarily, is erroneous; that while the felonious

intent of the party taking the property of another need not necessarily be an intention to convert the property to his own use, still it must in all cases be an intent wholly and permanently to deprive the owner thereof; that the taking of the bicycle of another temporarily for revenge, with intention to return it, is not larceny, but only a trespass. (See also *Hayes* v. *Financial Indem. Co.*, 118 Cal.App.2d Supp. 883 [257 P.2d 765].) Accordingly, it appears to us that the oral instruction given by the judge was contrary to the one previously given, and must have confused the jury to such an extent that it did not believe that before it could convict the defendant of the crime of burglary it must first find that defendant, at the time he entered the room, intended to wholly and permanently deprive the owner of property therein by theft. A new trial on this count' should be ordered and tried under proper instructions.

 As to the third count, defendant concedes he took the gun involved, had it in his possession, and was ''hunting ducks with it'' on Sunday. The evidence is in conflict as to whether he actually took the gun on Sunday morning or when he closed the bar on Sunday night and took his clothes with him. At any rate, he possessed it in the automobile glove compartment. It was placed there by him and was under his control and custody and apparently he was the only one who knew it was there. This is sufficient to show custody and control of the weapon by a person having been previously convicted of a felony in violation of Penal Code section 12021. (*People* v. *Warren*, 16 Cal.2d 103, 112 [104 P.2d 1024]; *People* v. *Hernandez*, 115 Cal.App.2d 435 [252 P.2d 75], and cases cited; *People* v. *Ekberg*, 94 Cal.App.2d 613 [211 P.2d 316]; *People* v. *Quong*, 5 Cal.App.2d 137 [42 P.2d 386].)

 It is next argued that it was error for the clerk to read and for the district attorney to refer to defendant's previous conviction of a felony since he admitted such conviction when arraigned, citing sections 1025 and 1093, subdivision 1, Penal Code. This would be true if defendant had not been charged with the offense of possession and control of a firearm capable of being concealed upon the person of one previously convicted of a felony. To this charge defendant entered a plea of not guilty. The clerk did not read the added count alleging prior conviction of a felony, which defendant admitted. It was proper for the clerk to read this portion of the information to the jury since the fact of former conviction was an integral part of the offense charged. (*People* v. *Forrester*,

116 Cal.App. 240, 242 [2 P.2d 558].) With respect to the prosecuting attorney, he questioned defendant on cross-examination as to his prior conviction of a felony, which is a proper method of impeachment. (Code Civ. Proc. § 2051.) Such impeachment is proper though the charge be admitted. (*People* v. *Crowley,* 100 Cal. 478, 482 [35 P. 84].)

 Next, defendant contends in his brief that two of the jurors associated defendant with an individual to whom reference was made during the trial, and that this association had a possible unfavorable reaction on the jury. No showing appears in the record as to this, hence there is nothing on which to predicate a charge of misconduct. Matters outside the record may not be considered on appeal. (*Rogers* v. *Tennant,* 45 Cal. 184; *Reed & Co.* v. *Harshall,* 12 Cal.App. 697 [108 P. 719] ; 2 Cal.Jur. 687, § 394.)

 Some complaint is made because the trial court overruled counsel for defendant's objections to certain questions being propounded to the defendant by the prosecutor on cross-examination. Defendant was asked how the gun came to be in the car. Objection was made to the question on the ground that the answer might tend to incriminate the defendant and he sought shelter therefrom under the Fifth Amendment to the United States Constitution. The court overruled the objection and defendant answered that he placed it there on Sunday afternoon. He claims, as we understand the argument, that he was accordingly forced into a confession, and without which the jury would not have convicted him on this count. We see no merit to the argument. Defendant denied knowledge of its presence in the car at the border and it would not exact much reasoning power to guess that defendant placed it there. This was all one transaction and defendant was subject to cross-examination on the part he had played in it. (Code Civ. Proc., § 2048; *People* v. *Kynette,* 15 Cal. 2d 731, 752 [104 P.2d 794] ; *People* v. *Warren,* 16 Cal.2d 103 [104 P.2d 1024] ; *People* v. *Peete,* 28 Cal.2d 306 [169 P.2d 924].)

That portion of the judgment relating to the burglary charge in count two is reversed and a new trial ordered. The remaining portion of the judgment is affirmed.

Barnard, P. J., and Mussell, J., concurred.

A petition for a rehearing was denied January 14, 1955, and appellant's petition for a hearing by the Supreme Court was denied February 2, 1955.