[Crim. No. 1. Fifth Dist. Dec. 1, 1961.]

THE PEOPLE, Plaintiff and Respondent, v. CHARLES I. ROMANO et al., Defendants and Appellants.

Russell E. Parsons and Edward I. Gritz for Defendants and Appellants.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and Jack K. Weber, Deputy Attorney General, for Plaintiff and Respondent.

CONLEY, P. J.—The defendants, Charles I. Romano, Emilio Aquilante, and Daniel Bozyk, were jointly charged with the burglary of Seiler's Men's Store in Bakersfield and in a second count with grand theft from the same establishment. The jury found Romano and Aquilante guilty on both counts and Bozyk guilty on the second count only. The de-

fendants appeal from the judgments and from the denial of their motions for a new trial.

Defendants contend, first, that the corpus delicti of the crimes charged in the information was not proved; secondly, that the court committed reversible error by receiving in evidence certain statements of the defendants made shortly after their arrest; and thirdly, that the district attorney was guilty of prejudicial misconduct.

On the morning of July 7, 1960, the three defendants, trailed by two Los Angeles police officers, drove a yellow Mercury automobile on Highway 99 from Los Angeles to Bakersfield; upon arrival, the defendants made a left turn on 19th Street to H Street, turned left again to 18th Street and went two blocks east to Chester Avenue; they parked at 17th Place and I Street near an alley, put on their suit coats, glanced in the rearview mirror, and straightened their neckties; Aquilante combed his hair. The three defendants then walked to Seiler's Men's Store and entered. The Bakersfield Police Department had been alerted and joined the Los Angeles police officers in maintaining a surveillance. One officer entered the store and posted himself in the rear of the room. He saw the men by the suit racks; one of them (Bozyk) brought with him a brief case, the partitions of which had been removed; he placed it on the floor out of the line of vision of the witness; one of the other men took some clothing from the suit rack and made a gesture toward the brief case. The store manager testified that he saw Romano and Aquilante there; no sale was made to any of the defendants, and, in fact, only one sale of a suit, to another person, was made during the day.

Defendants left the store; Bozyk was carrying the brown leather brief case; one officer testified that it bulged more than when the three defendants had gone inside; another officer described it as "considerably thicker"; a third policeman said that it was then "so full it appeared to be round." Bozyk walked out of sight while Romano and Aquilante stood in front of the store momentarily and then returned to the car where they placed the brief case in the trunk. They then drove about eight blocks and parked two blocks away from the original parking spot. Again, they got out of the car, walked two blocks north to 20th Street, and separated. Bozyk walked north; Romano and Aquilante went back toward the car, secured a cardboard box, got in the car, drove to 20th Street, picked up Bozyk and drove at high speed to a deadend. They

opened the trunk of the car, got back in the car, drove onto Highway 99 and started south toward Los Angeles.

When they left Bakersfield Aquilante was driving; Romano was seated in the right front seat; and Bozyk in the rear of the car. A Bakersfield police officer followed about two car lengths behind. He saw Romano drop something out of the car; he stopped their vehicle one-fourth of a mile north of the town of Greenfield and found six new suits on hangers in a pile on the floor, the labels having been torn from the clothing. The now empty brief case was also in the automobile.

Four suit labels were found along the route taken by the defendants, three on that day and one the next day, all in the vicinity of 3rd Street and Highway 99 in an island portion of the highway.

Defendant Aquilante, when questioned at the time of his arrest, said he was a clothing jobber from Los Angeles. When his attention was called to the fact that all the labels had been removed from the garments found in the car, Aquilante showed the police officer that the label was also missing from the suit he was wearing. He claimed that the suits had been bought from a clothing outlet store and that they were to be sold to any available purchaser.

Seiler's Store was unable to determine if any specific item received by it from the manufacturer was missing, as they maintained only a cost and retail inventory; instead of keeping track of specific garments, they merely deducted from the value of their remaining stock all sales actually made. They carried Pinkus Brothers clothing, and Seiler's was the only store in Bakersfield which did so. The suits taken from the car were identified by a representative of Pinkus Brothers by comparing the clothing to swatches retained by the manufacturer and by the labels. He testified that each manufacturer has its own set of numbered labels. The cloth used in suits has lot numbers, and the shipping orders record these numbers. Pinkus Brothers had done business with Seiler's for many years, and from the shipping orders the manufacturer's representative could testify that the garments with these lot numbers had been shipped to Seiler's between September 1959 and May 1960. Proof was made that these goods were received by Seiler's.

An expert criminologist testified that he discovered part of the tag letters of the name ''Seiler's'' still inside the lining of one of the suits; in his opinion two of the recovered coat labels had at one time been sewn in two of the suits. All

of the suits were size 40 or 42, and each would retail for $69.50 to $75.

The police demonstrated to the jury that all of the clothing and hangers would go into the brief case.

It is, of course, essential in a charge of burglary to prove that the defendant entered the building with the specific intent to commit theft or some felony; as applied to theft, the intent must be to deprive the owner permanently of his property. Because of the particular inventory system used by Seiler's, the store manager could not say that a certain specific number of suits was missing on the day of the crime, but he did testify that the suits found in the defendants' automobile were the type sold in the store, that the two labels found were Seiler's labels, and that this was the only store in Bakersfield carrying that brand.

*People* v. *Corral,* 60 Cal.App.2d 66, 71 [140 P.2d 172] holds:

"It was not necessary for any representative of the store to appear and testify to its ownership of the suits. Except for the bearing of that fact on the question of defendant's intent in entering the store, it was not material to the charge of burglary, for burglary would be complete without an actual theft (4 Cal.Jur. 720); and it was sufficiently proved by the showing that when defendant took the suits they were in possession of the store on hangers which were on the racks in its salesroom. (*People* v. *Hayes* (1925) 72 Cal.App. 292, 299 [237 P. 390]; *People* v. *Brannon* (1939) 30 Cal.App.2d 445 [86 P.2d 842].)"

In *People* v. *Brannon, supra,* 30 Cal.App.2d 445, 446 [86 P.2d 842] the defendant entered a café, and, having removed the glass coverings on two slot machines, appropriated 97 dimes and 23 nickels therefrom; the burglary conviction was affirmed, for,

"It is the established law of this jurisdiction that proof that property was in the possession and under the control of the person from whom it is claimed to have been taken is sufficient proof of ownership to sustain a conviction of burglary." (See also *People* v. *Hayes,* 72 Cal.App. 292, 298 [237 P. 390]; *People* v. *Kirsch,* 204 Cal. 599, 602 [269 P. 447]; and *People* v. *Davis,* 97 Cal. 194 [31 P. 1109].)

*People* v. *Corral, supra,* 60 Cal.App.2d 66, 71 [140 P.2d 172] also considers proof of specific intent on the part of the defendant, saying:

"Perhaps the mere fact that defendant committed a theft while inside the store is not sufficient to show his intent when

he entered [citation] but here there are other facts. The defendant had on, when he made his entry, a belt which could be so adjusted as to make possible the concealment of a suit within his trousers; and not only did he take and conceal by this means one suit from the store, but after disposing of it he returned there and took another suit and concealed it in the same manner. These and the other circumstances shown are ample to support a finding that he entered the store with intent to commit theft.''

The appellants, in stressing their claim that the necessary intent to prove burglary was not shown, rely on cases in which the circumstances of the alleged offenses made intent uncertain. (*People* v. *Brown,* 105 Cal. 66 [38 P. 518] ; *In re Connell,* 68 Cal.App.2d 360 [156 P.2d 483] ; and *People* v. *Garrow,* 130 Cal.App.2d 75 [278 P.2d 475].) In the *Brown* case, *supra,* there was evidence that defendant took a bicycle, that he was a 17-year-old boy who did this to ''get even,'' and that he never intended to keep it permanently. The *Connell* case, *supra,* determined that a conviction in Utah which did not charge the defendant with taking an automobile with intent to deprive the owner of title or possession did not fall within the classification of cases which could be utilized to justify the sentencing of a defendant as an habitual criminal. In the *Garrow* case, *supra,* it appeared that the defendant was a friend of the owner of a bar; that he worked for him, had driven his car, had slept in the same building and had eaten at the same table; he was entrusted with the keys to the Cadillac car of the complaining witness and the keys to the bar, and he had been shown a gun owned by a previous owner of the bar; when it was discovered that the Cadillac and the gun were gone, he maintained that he had borrowed both the gun and the car.

But in the present case there can be no doubt that in taking the clothing the defendants intended permanently to deprive the owner of the property. When apprehended they were headed back toward Los Angeles; they denied that they had taken the clothing from Seiler's, claimed that Aquilante had bought it elsewhere and said they intended to sell it.

*People* v. *Tims,* 171 Cal.App.2d 671, 674 [341 P.2d 56] holds: ''The element of entry, like any other element of the corpus delicti, need not be proved by direct, positive evidence, but may be proved by circumstantial evidence and reasonable inferences to be drawn therefrom,'' citing *People* v. *Sparks,* 82 Cal.App.2d 145 [185 P.2d 652].

630

Here there was direct as well as circumstantial evidence in the record, and the proof of burglary and grand theft was amply sufficient. (See *People* v. *Barry*, 94 Cal. 481 [29 P. 1026]; *People* v. *Brittain*, 142 Cal. 8 [75 P. 314, 100 Am.St. Rep. 95]; *People* v. *Smith*, 145 Cal.App.2d 149 [302 P.2d 63]; *People* v. *McClure*, 133 Cal.App.2d 631 [284 P.2d 887]; *People* v. *Kellner*, 67 Cal.App.2d 477 [154 P.2d 425]; *People* v. *McCann*, 34 Cal.App.2d 376, 377 [93 P.2d 643].)

Appellants contend that the court committed prejudicial error in admitting evidence concerning the questioning of the defendants by police officers soon after their apprehension. It should be noted at the outset that there is no claim that there was police brutality or coercion or other mistreatment of the defendants; what they said was said freely and voluntarily. ██ ██ Police custody does not in itself make such evidence inadmissible (*People* v. *Gotham*, 185 Cal.App.2d 47, 55 [8 Cal.Rptr. 20]), and fair police questioning may take place even after a request for counsel. (*Crooker* v. *California*, 357 U.S. 433 [78 S.Ct. 1287, 2 L.Ed.2d 1448].)

The statement of Romano was as follows:

. . . . . . . . . . . . . .

" 'Q. Charles, my name is Charles Moak, I am with the Detective Division, Bakersfield Police Department. This is Dud Paslay, also of the Detective Division, Mrs. Ashby, who is one of our recording secretaries. You have been arrested on suspicion of shoplifting. The shoplifting occurred at Seiler's Men's Store at 1510 18th Street in Bakersfield. This occurred between the hours of 12:30 and 1:30. You fellows were observed in the store by the manager, Mr. Nick Dokolas, who is manager of Seiler's Store. Also you were observed by one of our policemen placing stuff in the rear of your car. You have been under surveillance since leaving Los Angeles this morning and the purpose of your trip to Bakersfield is more or less known, and immediately upon your arrival in Bakersfield we picked up your trail and you were under the surveillance of our officers from the time you hit the city limits of Bakersfield until your apprehension on 99 Highway. You have heard my statement of the accusation, Charles. What can you tell us from your part? A. I have no comments, not at the moment, until I speak to my attorney.

" 'Q. You do not want to comment until you have talked to your attorney? A. I don't know anything about this procedure.

" 'Q. You refuse to make any statement whatsoever? A. Yes, I do.

" 'Q. Now, Charles, under the circumstances prevailing in this case, I am going to charge you, along with your partners, with burglary. In other words, PC 459, since the fact that you entered the store with the intention of removing merchandise, or apparently having done so. You will be given a chance to contact your lawyer after you have been booked in the county jail on these charges. You still refuse to make any statement whatsoever? A. Yes, I do. . . .

" 'Q. In the presence of Detective Paslay and Mrs. Ashby, you will ascertain that no duress has been made upon you for any statement whatsoever, and have been made to understand that you will be permitted to see your lawyer, is that right? We have not forced any statement out of you whatsoever? A. No.' "

As to Aquilante, the record shows:

" 'Moak Q. Emilio, would you state your name in full for the record? A. Emilio Aquilante.

" 'Q. Emilio, this is Detective Paslay. I am Detective Moak. This is Mrs. Ashby, our recording secretary. I have talked a little to you, Emilio, and you know what you are here for? A. I don't.

" 'Q. Well, you are being charged with burglary of men's clothing from Seiler's Men's Store. I would like to state to you before we start that you have been under surveillance since early morning. Your surveillance was picked up by Bakersfield detectives when you entered the city limits of Bakersfield. Your movements were watched and timed from that time until apprehended on 99 Highway at approximately 1:30 this date. At the time of your apprehension and my arrival at the scene, merchandise was removed from your car that had been taken from Seiler's Men's Clothing between the hours of 12:30 and 1:30, as could be best described by the man[ag]er of Seiler's Men's Clothing this date. The merchandise in your car consisted of six men's suits valued at $480.00, retail price. A charge of burglary is being placed on you and your partners, since it is evident that the intent to remove merchandise from Bakersfield was the purpose of your coming to this city. You have heard my statement to you. Now, I would like to ask you if you have, or will you make a statement to me, concerning the clothes? A. No comment.

" 'Q. In other words, you refuse to make a statement? A. Well, I want to see my lawyer. I don't understand what

is talked here. Maybe my lawyer will understand it a little better than I do.

" 'Q. Then you do refuse to make any statement concerning this charge against you? A. Until I see my lawyer. I think they are all false charges.

" 'Q. After you are booked in the county jail, you will be given permission to make one telephone call, local or will be given permission to contact a bail bondsman. At no time during this interview has Officer Paslay or myself used any force or duress on you to have you make a statement to us, is that right? A. No comment.

" 'Q. We have used no force on you to get you to make a statement? We have made no threats or tried to touch you? A. So far. At this time.

" 'Q. You have been assured that you will be permitted to talk to your lawyer? A. When I speak to him, then I know I am actually speaking to him. I don't know why I am here, I can't understand that, burglary.

" 'Q. We have found the labels from the suits. The labels were thrown out of the car on Brundage near Union.'

"There is no answer to that question."

With regard to Bozyk's statement, the testimony shows:

. . . . . . . . . . . . . . .

" 'Q. Daniel, this is Detective Paslay. I am Detective Moak. This is Mrs. Ashby, our recording secretary. The reason you are in here is that you are being charged as part of a gang who were involved in shoplifting from Seiler's Men's Store between the hours of 12:30 and 1:30 this date. The charge is being made on you three fellows, you and your two partners, will be that of burglary, PC 459 of the California Penal Code. You were seen or observed to remove, the three of you, six suits from Seiler's Men's Clothing. A. I don't know anything about it.

" 'Q. Before going further, I would like to state to you that you fellows have been under observation throughout the entire day, from the time you entered Bakersfield until you were apprehended on 99 Highway. The retail value of these six suits taken is $480.00, which comprises grand theft or burglary. You three fellows were observed to place the merchandise in your car by an officer of this department. Can you tell me in your own words, or would you make a statement in your own words, Daniel, regarding your part in this? A. I can't say nothing, I don't know nothing about it.

" 'Q. In other words, you refuse to make a statement? A. I can't, I don't know anything about it.

" 'Q. Daniel, how long have you known Charles and Emilio? A. About four months.

" 'Q. What time did you leave Los Angeles this morning? A. I imagine about 10:00, 10:30, around there.

" 'Q. When you came to Bakersfield, what were your first movements? A. The car was starting to make a lot of noise, so we stopped to get it checked.

" 'Q. What store did you go to in Bakersfield? A. I didn't go to no store.

" 'Q. What amount of shopping did you do in Bakersfield? A. None at all. Just walked by stores, that's all.

" 'Q. In other words, when Charles and Emilio went to this store, you did not go in with them? A. I didn't see them go in. They were with me.

" 'Q. How did the merchandise get in your car then? A. I don't know. Charles does that kind of work, buys and sells stuff.

" 'Q. Did he buy this merchandise from Seiler's Men's Store here in Bakersfield? A. Who is Seiler's Men's Store? Not that I know of.

" 'Q. Why did he have merchandise identified as Seiler's merchandise if he did not buy it? A. I don't know.

" 'Q. You did not have it in your car when you entered Bakersfield? A. I imagine he did.

" 'Q. In other words, Daniel, you won't cooperate? A. I am cooperating, much as I know.

" 'Q. How long have you been in the West? A. About four and a half, five months.

" 'Q. You have known Emilio and Charles about four months? A. That's right.

" 'Q. During that time you have traveled over California extensively? A. No, this is the first time I have been this far North.

" 'Q. What kind of work do you do? A. Well, I was doing machine work, and right now I'm helping out in a restaurant, short order cook.

" 'Q. Daniel, for your own information, the best you could give us in the statement now would be to your benefit. A. I just told you what happened. I'm going along with you, I told you what I know.

" 'Q. You are not going along with me, because I have posi-

tive proof the merchandise was removed from Seiler's [M]en's Store. A. I know he had some.

" 'Q. But you know he did not have them in the car when you came to Bakersfield? A. Yeah, I said he did.

" 'Q. In due time, as soon as our records can be completed here and information obtained, we are going to book you in the county jail on suspicion of burglary, due to the fact that information we have indicates that you came to Bakersfield with the intention of shoplifting merchandise, which to us is burglary. You will be given an opportunity to call your lawyer or bondsman, whichever you may like. In the event that you should change your mind and like to make a different statement in regard to this incident, you may call myself or other officer of this department, and to go on record, I would like to confirm that no force or duress has been made upon you to obtain a statement regarding this case, is that true? We have not used any force on you to get a statement from you? A. Oh, no, no.

" 'Q. And you have refused to give any statement implicating yourself or your partners? A. I haven't refused, I just told you what happened.

" 'Q. That is right, you have not given any statement regarding you or your partners in this offense? A. About what, burglary? I don't know anything about it. There was no merchandise stolen, not that I know of.

" 'Moak Q. You have been arrested and will be booked on a charge of burglary. You will stand trial for such here in Bakersfield. You were in possession of stolen merchandise when apprehended by officers of of [sic] this department, and whether or not you have been arrested and stood trial anywhere before or not, you will be tried here in Bakersfield. Any statement you can make if you are not involved will help you, you know. And you know where the merchandise in your car was stolen from, a store in Bakersfield. You were watched from the time you hit Bakersfield. We know when and what time the merchandise was removed. We know you were a part of the bunch that removed it. The best thing you can do is come clean and clear, and I can promise you that you stand a chance for a prison term for burglary in this case. A. I have nothing to say. What can I say? I just told you what happened, and that's it.

" 'Q. I gather that you just refuse to reveal what has happened, so to speak, right? A. I don't know. I told you what happened, and that's it. That's Romano's merchandise.

" 'Q. It can't be, because it has Seiler's jobber's number in it. It has been positively identified by the manager of Seiler's and one of his assistants. A. I don't know.' "

The ground upon which such evidence is admitted is that the conduct of a defendant in the face of an accusatory statement may aid the jury in determining his guilt or innocence. (*People* v. *Long,* 7 Cal.App. 27 [93 P. 387]; *People* v. *Jolley,* 35 Cal.App.2d 159 [94 P.2d 1011]; *People* v. *Teshara,* 134 Cal. 542 [66 P. 798]; *People* v. *Bringhurst,* 192 Cal. 748 [221 P. 897]; *People* v. *Richardson,* 83 Cal.App. 302 [256 P. 616]; *People* v. *Yeager,* 194 Cal. 452, 486-487 [229 P. 40].)

Evidence of an accusation alone or of an accusation followed by a specific denial by a defendant is, however, hearsay and inadmissible. (*People* v. *Weber,* 149 Cal. 325 [86 P. 671]; *People* v. *Teshara, supra,* 134 Cal. 542 [66 P. 798]; *People* v. *Wong Loung,* 159 Cal. 520 [114 P. 829]; *People* v. *Vogel,* 36 Cal.App. 216 [171 P. 978]; *People* v. *Wignall,* 125 Cal.App. 465 [13 P.2d 995]; *People* v. *McCoy,* 127 Cal.App. 195 [15 P.2d 543]; *People* v. *Bob,* 29 Cal.2d 321 [175 P.2d 12]; *People* v. *Simmons,* 28 Cal.2d 699 [172 P.2d 18]; *People* v. *McEvers,* 53 Cal.App.2d 448 [128 P.2d 93]; *People* v. *Butler,* 118 Cal.App.2d 16 [257 P.2d 109]; *People* v. *Staker,* 154 Cal.App.2d 773 [316 P.2d 725].)

If a denial of guilt is coupled with additional statements or equivocal or evasive responses the evidence is properly received. (*People* v. *Carmelo,* 94 Cal.App.2d 301, 306-307 [210 P.2d 538]; *People* v. *Peterson,* 29 Cal.2d 69 [173 P.2d 11]; *People* v. *Wade,* 71 Cal.App.2d 646 [163 P.2d 59]; *People* v. *Bradley,* 23 Cal.App. 44 [136 P. 955]; *People* v. *Kazatsky,* 18 Cal.App.2d 105 [63 P.2d 299]; *People* v. *Orloff,* 65 Cal.App.2d 614 [151 P.2d 288]; *People* v. *Wilson,* 61 Cal. App. 611, 621 [215 P. 565]; *People* v. *Gordon,* 61 Cal.App. 98 [214 P. 276]; *People* v. *Kelly,* 203 Cal. 128 [263 P. 226]; *People* v. *Krug,* 10 Cal.App.2d 172 [51 P.2d 445]; *People* v. *Brown,* 87 Cal.App.2d 281 [196 P.2d 936]; *People* v. *Mandell,* 48 Cal.App.2d 806 [120 P.2d 921]; *People* v. *Trotter,* 120 Cal. App. 54 [7 P.2d 731]; *People* v. *Morgan,* 87 Cal.App.2d 674 [197 P.2d 413]; *People* v. *Davis,* 43 Cal.2d 661, 670 [276 P.2d 801].) And where, besides a denial, the defendant makes an assertion of fact which is contradicted by other evidence or makes false, evasive or contradictory statements, the evidence is admissible for such weight as the trier of fact may give it. (*People* v. *Philbon,* 138 Cal. 530 [71 P. 650];

*People* v. *Wilson, supra*; *People* v. *Goltra,* 115 Cal.App. 539 [2 P.2d 35] ; *People* v. *McCoy, supra,* 127 Cal.App. 195 [15 P.2d 543] ; *People* v. *Cole,* 141 Cal. 88 [74 P. 547] ; *People* v. *Turner,* 1 Cal.App. 420 [82 P. 397] ; *People* v. *Megladdery,* 40 Cal.App.2d 748 [106 P.2d 84] ; *People* v. *Hickok,* 56 Cal. App. 13 [204 P. 555].) ▮ A statement by a defendant, in the face of an accusation, that he has nothing to say is in no sense a denial, and the evidence is admissible. *(People* v. *Egan,* 77 Cal.App. 279 [246 P. 337] ; *People* v. *McCoy, supra.)* ▮ And where an accusation is partly admitted and partly denied, the entire conversation is properly received. *(People* v. *Trotter, supra.)*

▮ ''It is for the court in the first instance to determine whether the import of the statements is such that it would furnish a foundation for proof of conduct, and it is then for the jury to decide whether the accused was aware the statements were made, whether, under all the circumstances shown, they called for a disclaimer, whether the accused did reply to them, and whether if he did not do so, such failure showed criminal intent or a consciousness of guilt.'' *(People* v. *Yeager, supra,* 194 Cal. 452, 486 [229 P. 40].) (See also *People* v. *Chavez,* 50 Cal.2d 778 [329 P.2d 907].)

▮ A basic complaint of defendants' counsel now seems to be that ''in effect'' their rights under the Fifth Amendment to the United States Constitution were violated. That objection was not made in the trial court; there it was claimed only that the general effect of the answers was a denial of the charges and that the admitted testimony constituted hearsay. Consequently, that point cannot be raised for the first time on the appeal. *(People* v. *Carter,* 192 Cal.App.2d 648, 661 [13 Cal.Rptr. 541] ; *People* v. *Hurst,* 36 Cal.App.2d 63, 65 [96 P.2d 1003] ; *People* v. *Kozakis,* 102 Cal.App.2d 662, 665 [228 P.2d 58] ; *People* v. *Odom,* 72 Cal.App.2d 72, 74 [164 P.2d 68] ; *People* v. *Pickens,* 190 Cal.App.2d 138, 148 [11 Cal.Rptr. 795].)

▮ Considering the objections to the statements of Romano and Aquilante on the grounds urged during the trial, we must first inquire whether the answers and conduct of Romano and Aquilante were evasive and equivocal in any particular. Romano said: ''I have no comments, not at the moment, until I speak to my attorney.''

And Aquilante said: ''No comment.'' . . . ''Well, I want to see my lawyer. I don't understand what is talked here. Maybe my lawyer will understand it a little better than I do.''

The tag phrase "no comment" is usually resorted to by statesmen or politicians when hard pressed by inquiring reporters; it means, "I do not affirm, I do not deny, I have nothing to say at this time." These answers were certainly equivocal and evasive and were admissible.

We must then inquire further whether the objections made in the court below to other parts of the statements were sufficiently pinpointed to make them available to defendants on the appeal.

The objections below were, without exception, general and went to the whole of the statements and not to any specific part of them. An objection to a statement or document offered in evidence, part of which is admissible, must be specifically directed to the inadmissible portion. (*People* v. *Pickens, supra,* 190 Cal.App.2d 138, 148 [11 Cal.Rptr. 795, 801]; *People* v. *Lang Transportation Corp.,* 43 Cal.App.2d 134, 140-141 [110 P.2d 464]; McCormick on Evidence, pp. 119-120.) The requirements of this rule were not observed by counsel, and consequently they cannot now claim error in the admission of the full statement.

It is the general rule that in the absence of a timely and proper objection in the trial court, alleged error cannot be urged on appeal. (*People* v. *Wein,* 50 Cal.2d 383, 401-402 [326 P.2d 457]; *People* v. *Millum,* 42 Cal.2d 524, 528 [267 P.2d 1039]; *People* v. *Scaggs,* 153 Cal.App.2d 339, 356 [314 P.2d 793]; *People* v. *Gaines,* 192 Cal.App.2d 128, 131-134 [13 Cal.Rptr. 359].)

It should be noted in passing that nowhere in the remarks made by any of the defendants was there a statement that he refused to answer on the ground it might tend to incriminate him (*People* v. *Calhoun,* 50 Cal.2d 137, 147 [323 P.2d 427]), or that he refused to answer on the advice of counsel (*People* v. *Abbott,* 47 Cal.2d 362, 373 [303 P.2d 730]; *People* v. *McGee,* 31 Cal.2d 229, 239 [187 P.2d 706]).

We believe, furthermore, that no prejudice was suffered by defendants by the admission of the evidence objected to, because proof of the commission of the offenses by the defendants was so clear and convincing that the testimony complained of could not have changed the result. (*People* v. *Terry,* 180 Cal.App.2d 48, 60 [4 Cal.Rptr. 597]; *People* v. *King,* 114 Cal.App.2d 95, 103-105 [249 P.2d 563]; *People* v. *Duarte,* 183 Cal.App.2d 393, 401-402 [6 Cal.Rptr. 711]; *People* v. *Simmons, supra,* 28 Cal.2d 699, 721 [172 P.2d 18].)

 The entire statement of Bozyk was clearly admissible, because he made false averments of fact which he himself admitted were not true when he testified.

''Falsehoods and deceptions or inconsistent and conflicting statements by a defendant as to a matter relevant to the issues are admissible against him as indicating a consciousness of guilt. . . .'' (Fricke, California Criminal Evidence (5th ed. 1960), Falsehood, p. 80.)

The defendants also assign as error three alleged instances of misconduct of the district attorney.

 The first was the development on cross-examination of Bozyk that he had been previously arrested for a misdemeanor; this was not improper in view of his testimony on direct examination by his own counsel that he had never been arrested before. (*People* v. *Buckley,* 143 Cal. 375, 389-390 [77 P. 169]; *People* v. *Zerillo,* 36 Cal.2d 222, 227-229 [223 P.2d 223]; *People* v. *Westek,* 31 Cal.2d 469, 479 [190 P.2d 9].)

 Next, defendants complain of the following portion of the district attorney's closing argument:

''Now let's go back. Now he accuses everybody. He states that my duty, ladies and gentlemen, is to convict. It is, ladies and gentlemen, when the defendants are guilty, only persons that we believe to be guilty. Our duty is also to protect the innocent, but we make an investigation of the case. We would not be here, I submit, ladies and gentlemen, if we did not believe these defendants to be guilty. There are cases from time to time where there is some question, we check out very carefully and if we believe there is reasonable doubt of his innocense [*sic*] in a case, we don't hesitate to dismiss the case. But, I would not be here, ladies and gentlemen, I submit, if I wasn't doing my duty. I feel very strongly about that duty in this case. This case is important, not only to us, but to the Police Department, the Los Angeles Police Department, and it is important to you too, ladies and gentlemen. We cannot let these people continue with their activities in this County, in this City. We must do what we can to stop them now. We need your cooperation, ladies and gentlemen. From the time this case was commenced on July 27th to now, the attack of the defense has been one continuous stall, right up to the time of trial, through the trial. Every possible method has been used to get this case tossed out. Motions, counter motions and we are now here, ladies and gentlemen, presenting the evidence to you for your decision.''

The district attorney was apparently egged on by disparag-

ing remarks in the argument of defendants' counsel; his reply is therefore understandable, but not justifiable. No prosecuting officer has a right to go outside the record in arguing the guilt of a defendant. (*People* v. *Kirkes,* 39 Cal.2d 719, 721-727 [249 P.2d 1]; *People* v. *Beal,* 116 Cal.App.2d 475, 477 [254 P.2d 100]; *People* v. *Quigley,* 157 Cal.App.2d 223, 227-229 [320 P.2d 936]; *People* v. *Bell,* 138 Cal.App.2d 7, 13-14 [291 P.2d 150]; *People* v. *Shaffer,* 150 Cal.App.2d 287, 294 [309 P.2d 475].)

However, defense counsel made no objection to the district attorney's argument and no motion for an instruction by the court relative to the error.

 "As stated in *People* v. *Berryman* (1936), 6 Cal.2d 331, 337 [57 P.2d 136], 'The general rule regarding misconduct of the district attorney which tends to and is likely to result in prejudice to the defendant is that where no objection is made to such misconduct by the defendant, or where objection is made and the court sustains the objection and properly admonishes the jury, the misconduct claimed to be prejudicial to defendant's rights will not furnish grounds sufficient to justify the granting of a new trial or the reversal of the judgment. [Citation.] There are two exceptions to this general rule. One is where the case is closely balanced and there is grave doubt of defendant's guilt, and the acts of misconduct are such as to contribute materially to the verdict, a miscarriage of justice results requiring a reversal. [Citation.] The other exception is where the act done or remark made is of such a character that a harmful result cannot be obviated or cured by any retraction of counsel or instruction of the court. In such cases the misconduct will furnish ground for a reversal of the judgment, even where proper admonitions are given by the court. [Citations.]' '' (*People* v. *Lyons,* 50 Cal.2d 245, 262 [324 P.2d 556].)

 If an objection had been made, it seems probable that an admonition by the court would have completely relieved the impropriety. (*People* v. *Chavez, supra,* 50 Cal.2d 778, 793 [329 P.2d 907].) We are convinced that the error was not of sufficient weight or importance in the circumstances to justify a reversal. (Cal. Const., art. VI, § 4½.)

 Lastly, defendants complain of the reference of the district attorney in his argument to the failure of Romano to testify. This comment was within proper limits and was admissible. (Cal. Const., art. I, § 13; *People* v. *Adamson,*

27 Cal.2d 478, 486-490 [165 P.2d 3]; *People* v. *Sauer,* 163 Cal.App.2d 740, 746-747 [329 P.2d 962]; Pen. Code, § 1323.)

The judgments and orders denying the motions for a new trial are affirmed.

Brown, J., and Stone, J., concurred.